IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREGORY A. HOLIFIELD and GH BLUE HOLDINGS, LLC, | § § § | No. 407, 2022 |
| Defendants Below, Appellants/Cross-Appellees, | § § § § | |
| v. | § § § § | Court Below: Court of Chancery of the State of Delaware |
| XRI INVESTMENT HOLDINGS LLC, | § § | I.D. No. 2021-0619 |
| Plaintiff Below, Appellee/Cross-Appellant. | § § § | |

Submitted: June 28, 2023
Decided: September 7, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **GRIFFITHS**, Justices; and **NEWELL**, Chief Judge,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware. **AFFIRMED in part**, **REVERSED in part**, **and REMANDED**.

Michael W. McDermott, Esquire (*argued*), Richard I. G. Jones, Jr., Esquire, David B. Anthony, Esquire, Zachary J. Schnapp, Esquire, Harry W. Shenton, IV, Esquire, BERGER HARRIS LLP, Wilmington, Delaware *for Defendants Below, Appellants/Cross-Appellees*.

A. Thompson Bayliss, Esquire (*argued*), Eric A. Veres, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware. *Of Counsel*: Robert N. Hochman, Esquire, SIDLEY AUSTIN LLP, Chicago, Illinois, Margaret Hope Allen, Esquire, Angela C. Zambrano, Esquire, Yolanda Cornejo Garcia, Esquire, SIDLEY AUSTIN LLP, Dallas, Texas, Robin Wechkin, Esquire, SIDLEY AUSTIN LLP, Issaquah, Washington, *for Plaintiff Below, Appellee/Cross-Appellant*.

---

[1] Chief Judge Newell is sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a), to complete the quorum.

**VALIHURA**, Justice:

Defendants-below, appellants, cross-appellees, Gregory Holifield ("Holifield") and GH Blue Holdings, LLC ("Blue"), appeal the Court of Chancery's September 19, 2022 memorandum opinion in favor of plaintiff-below, appellee, cross-appellant, XRI Investment Holdings LLC ("XRI"). The issue in this litigation is whether Holifield validly transferred his limited liability membership units in XRI to Blue on June 6, 2018. The resolution of that predicate issue bears on the ultimate dispute between the parties not being adjudicated here, namely, whether XRI validly delivered to Holifield a strict foreclosure notice purporting to foreclose on the XRI membership units, or whether such notice was incorrectly delivered to him because Blue was, in fact, the owner of the units following the transfer.

Following a one-day trial, the Court of Chancery determined that the transfer of the units from Holifield to Blue was invalid because it was not a permitted transfer under XRI's limited liability company agreement, which provides that noncompliant transfers of XRI interests are "void." The trial court, in interpreting this Court's holding in *CompoSecure, L.L.C. v. CardUX, LLC*,[2] held that the use of the word "void" in XRI's LLC agreement rendered the transfer incurably void, such that affirmative defenses did not apply. Despite

---

[2] *CompoSecure, L.L.C. v. CardUX, LLC (CompoSecure II)*, 206 A.3d 807, 816 (Del. 2018). There are four decisions in the *CompoSecure* family. *CompoSecure II* affirmed in part and reversed in part the Court of Chancery's decision in *CompoSecure, L.L.C. v. CardUX, LLC (CompoSecure I)*, 2018 WL 660178 (Del. Ch. Feb. 1, 2018), and remanded the case for further proceedings. The trial court issued its report on remand in *CompoSecure, L.L.C. v. CardUX, LLC (CompoSecure III)*, 2019 WL 2371954 (Del. Ch. June 5, 2019). This Court affirmed *CompoSecure III* in *CompoSecure, L.L.C. v. CardUX, LLC (CompoSecure IV)*, 213 A.3d 1204 (Del. 2019).

this holding, the trial court, in dicta, further found that XRI had acquiesced in the transfer. In doing so, the Court of Chancery, in dicta in its 154-page opinion, detailing the division between law and equity from the time of medieval England, concluded that this Court should reconsider its ruling in *CompoSecure II* which allows parties to an LLC agreement to contract for incurable voidness. The trial court urged us to adopt a rule wherein only acts that violate the laws of the State, as sovereign, are incurably void.[3]

Holifield adopts the Vice Chancellor's suggestion on appeal, urging this Court to: (i) overrule *CompoSecure II* and instead reserve incurable voidness for acts that violate limits imposed by the State; (ii) hold that the trial court erred in applying *CompoSecure II* to the contractual language here; (iii) require more specific and emphatic language, such as "null and void *ab initio*," as opposed to "shall be void," before finding that parties have contracted for incurable voidness; or (iv) hold that incurable voidness does not extend to the affirmative defense of acquiescence.

XRI contests each of Holifield's arguments and raises certain others on cross-appeal. It argues that: (i) the trial court erred by dismissing XRI's claim for breach of contract damages related to an action filed against XRI in Texas; and (ii) the trial court erred by dismissing XRI's claim for recoupment of legal expenses advanced to Holifield under XRI's LLC agreement. XRI asks this Court to remand the case to the trial court and

---

[3] We note that the Vice Chancellor emphasizes that he "is not suggesting that the reasoning in *CompoSecure II* is wrong," and that, "[t]o the contrary, the contractual analysis conducted in *CompoSecure II* is one possible approach that emphasizes the text of an agreement, and the analysis follows straightforward contractarian principles." *Chancery Opinion*, 283 A.3d at 646–47. Instead, the Vice Chancellor's discussion represents his "suggestion regarding a preferable approach." *Id*. at 647.

to instruct the trial court to determine whether Holifield acted willfully or with gross negligence in breaching the LLC agreement.

For the reasons set forth below, we AFFIRM the Court of Chancery's judgment with respect to the Blue Transfer (defined below) and we REVERSE the Court of Chancery's judgment insofar as it precludes XRI's recovery for breach of contract damages and recoupment of legal expenses advanced to Holifield. We hold that the trial court's finding of acquiescence as to only one of the alleged breaches does not bar either remedy and we REMAND for the trial court to make further determinations consistent with this opinion.

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND[4]

### A. Holifield and Gabriel Form XRI in 2013

XRI is a full-cycle water recycling and midstream infrastructure company servicing the energy exploration and production industry. Holifield and Matthew Gabriel ("Gabriel") founded XRI's predecessor entity in 2013 to explore business uses for non-potable water sources in the oil and gas industry. It was one of approximately a dozen business entities formed by the two men to explore business opportunities in various sectors.[5]

---

[4] Unless otherwise noted, facts are taken from the Court of Chancery's memorandum opinion. *See XRI Investment Hldgs. LLC v. Holifield*, 283 A.3d 581, 589–610 (Del. Ch. 2022) (hereinafter, "Chancery Opinion").

[5] *Id.* Holifield, a scientist, computer engineer, and military veteran, brought technological, scientific, and defense industry expertise to the partnership, while Gabriel, a transactional lawyer and businessman, brought transactional and financial expertise.

Holifield and Gabriel formed Entia, LLC ("Entia") to provide management services and personnel to the operating entities they formed together.[6] Entia's sole purpose is to provide management and personnel services; the entity has never owned any interest in the operating businesses. Instead, Holifield and Gabriel owned the interests personally. Holifield controlled Entia and Gabriel owned a minority stake in Entia.

*B. Holifield and Gabriel Sell a Controlling Interest in XRI to Morgan Stanley in 2016*

Three years after forming XRI's predecessor, in August 2016, Gabriel and Holifield sold a controlling interest in the entity to funds affiliated with Morgan Stanley (the "Morgan Stanley Sale"). Out of that sale emerged XRI in its current incarnation as a manager-managed Delaware limited liability company whose internal affairs are governed by a limited liability company agreement (the "LLC Agreement").

The LLC Agreement designated two classes of membership interests — "Class A Units," which Morgan Stanley received as the sole "Class A Member," and "Class B Units," which Holifield and Gabriel received as two of the three "Class B Members."[7] Holifield's Class B Units are the units underlying the parties' dispute (the "Disputed Units"). The LLC Agreement also provided that the entity be managed by a five-member board of directors (the "XRI Board"). As the sole Class A Member, Morgan Stanley had the right to designate three board members. It designated Logan Burt ("Burt"), Mark Bye,

---

[6] *Id.* at 594. At the height of its operations, Entia had approximately 265 employees.

[7] App. to Opening Br. at A0137 (LLC Agreement Schedule A). The third Class B member, who held significantly fewer units than either Holifield or Gabriel, was not a member of XRI at the time of this litigation. See *Chancery Opinion*, 283 A.3d at 610 ("Morgan Stanley and Gabriel are the only other members of XRI.").

and John Moon. As Class B Members, Holifield and Gabriel had the right to designate the remaining two board members. They designated themselves.

Importantly, the LLC Agreement also contains a provision that prohibits members from transferring their member interests (the "No Transfer Provision").[8] Although the provision generally prohibits transfers, it provides an exception for transfers to a "Permitted Transferee." A Permitted Transferee is defined in the LLC Agreement to include any entity owned solely by the transferring member (the "Permitted Transferee Exception").[9] However, to qualify for the exception, the transfer must be made for no consideration. If any transfer violates the No Transfer Provision, and does not qualify under the Permitted Transferee Exception, the transfer is "void" under the LLC Agreement (the "Contractual Voidness Provision").[10]

As part of the consideration for a controlling interest in XRI, XRI extended a loan to Entia (the "XRI Loan"). The XRI Loan, documented by a secured promissory note executed by Entia in favor of XRI (the "XRI Note"), contemplated a single balloon payment of $10,611,356.88, plus accrued interest, due on August 8, 2020. Holifield executed a personal guaranty in favor of XRI and secured both the XRI Note and the personal guaranty with the Disputed Units, as documented by a Unit Pledge Agreement. Accordingly, XRI filed a UCC-1 financing statement with the State of Florida on August 8, 2016, identifying Holifield as the debtor, XRI as the secured party, and the Disputed

---

[8] *Chancery Opinion*, 283 A.3d at 589; App. to Opening Br. at A0104 (LLC Agreement § 8.01(a)).

[9] App. to Opening Br. at A0059–60 (LLC Agreement § 1.01).

[10] *Id.* at A106 (LLC Agreement § 8.03).

6

Units as collateral. Thus, if Entia failed to repay the XRI Loan, XRI could levy on the Disputed Units.

In turn, Holifield and Gabriel used a portion of the proceeds of the Morgan Stanley Sale to repay a $5 million loan XRI had taken out in 2015. That loan was from Penta Mezzanine Fund, a fund managed by a private investment firm founded and managed by Seth Ellis ("Ellis"). The repayment of the loan resulted in an impressive return for Ellis and his fund, and cemented a strong professional relationship among Ellis, Gabriel, and Holifield.

After the closing of the Morgan Stanley Sale, Gabriel became CEO of XRI. This arrangement reflected Gabriel's substantial time commitment to the entity in the years leading up to the transaction. Meanwhile, Holifield managed the other portfolio companies he owned with Gabriel, including Entia.

## C. The Efforts to Raise Capital for Entia in 2018

In 2018, Holifield and Gabriel began working on ways to raise additional capital through Entia to provide funding to some of the operating businesses that they co-owned. Holifield wanted to raise $3.5 million through Entia but did not have the liquidity to raise the capital personally. Thus, he looked for external funding. As an initial step, Gabriel assigned all of his interest in Entia to Holifield for a nominal sum. According to Gabriel, he did so because he believed Entia to be in financial distress and that it would be easier for Holifield to raise capital if Holifield were the sole owner of Entia.

In addition to assigning his interest in Entia to Holifield, Gabriel helped Holifield explore how to use the Disputed Units to raise capital. The two men considered three

7

potential sources of funding: Morgan Stanley, Gabriel himself, and Ellis. After Gabriel and Holifield each failed to reach an agreement with Morgan Stanley for it to purchase some or all of the Disputed Units,[11] Gabriel explored the possibility of taking out a $2.5 million loan to purchase 2,502 of the Disputed Units himself, but abandoned this option when John Moon, a Morgan Stanley XRI Board representative, was "cool to the idea."[12] Thus, Holifield turned again to Ellis.

After Holifield contacted Ellis about the possibility of a loan to Entia, Ellis broached the topic with Gabriel, and the two discussed the potential loan at a May 8, 2018 meeting. At that meeting, Ellis asked Gabriel about Holifield's financial status. Gabriel told Ellis that Holifield had "got[ten] ahead of himself" financially and that "he needed this loan to help . . . get these other entities up and running."[13] The trial court credited Ellis's testimony that Ellis understood that Holifield had valuable assets and that Holifield "just needed to get himself in order."[14] Moreover, it credited Ellis's testimony that he had the impression that Gabriel "wanted [him] to help [Holifield] and help Entia."[15]

The next day, Gabriel sent Holifield a detailed spreadsheet showing, among other things, a capitalization table, Holifield's $20 million capital account and the XRI Loan,

---

[11] That effort entailed Gabriel reaching out to two of the Morgan Stanley board representatives — Burt and Moon, with whom he had a stronger relationship than did Holifield — about the possibility of Morgan Stanley purchasing some or all of the Disputed Units. Gabriel then advised Holifield on how to approach Burt.

[12] *Chancery Opinion*, 283 A.3d at 596.

[13] *Id.*

[14] *Id.*

[15] *Id.*

8

and a model of potential exit scenarios with the associated waterfall of proceeds at valuations of XRI ranging from $250 million to $600 million. Importantly, the spreadsheet showed that the Disputed Units would generate enough revenue in a sale to support both the XRI Loan and an additional loan, like the one contemplated by Ellis.[16] The Court of Chancery found that, "[b]ased on the context and subject matter of the spreadsheet, it is clear that Gabriel sent the spreadsheet to Holifield to help him secure a loan from Ellis."[17] At this point in time, neither Gabriel nor Holifield had raised with the Morgan Stanley representatives on the XRI Board the topic of encumbering the Disputed Units in a loan transaction.

Thereafter, Ellis and Holifield moved forward with the loan, which would be extended to Entia from Assurance Mezzanine Fund III, one of the funds Ellis managed (respectively, the "Assurance Loan" and "Assurance"). Holifield knew that Ellis viewed the Disputed Units as an important source of collateral and wanted some form of security in them. However, this time there was a problem: "Holifield also knew that the Disputed Units already provided security for the XRI Loan and that Morgan Stanley would reject any transaction structure that impaired XRI's rights."[18] Accordingly, as the trial court found, "Gabriel and Holifield brainstormed ways to structure a loan so that the arrangement

---

[16] *Chancery Opinion*, 283 A.3d at 596.

[17] *Id.* at 596–97.

[18] *Id.* at 597.

9

would be acceptable to Morgan Stanley while providing some degree of protection to Assurance."[19]

The initial plan was for Assurance to receive a pledge of the Disputed Units that would be junior to the pledge securing the XRI Loan. But Holifield's proposed arrangement was not acceptable to Morgan Stanley. On May 21, 2018, Holifield called Burt — one of the Morgan Stanley XRI Board representatives — with the understanding that Gabriel had already previewed the concept of the Assurance Loan to him. The LLC Agreement provided that any pledge of the Disputed Units required XRI Board approval, and so Holifield asked Burt to have the XRI Board approve Assurance's receipt of a second-position pledge, junior to the rights of XRI. After the call, Burt forwarded to the other Morgan Stanley XRI Board representatives materials Holifield sent him, including a draft pledge agreement, noting that "[a]ny pledge of these securities would require XRI board approval."[20]

The Vice Chancellor's factual findings suggest that this was the first time that Morgan Stanley was informed of the possibility of a loan to Entia that involved encumbering the Disputed Units. Only a few days passed before Burt informed Holifield that the proposal was unlikely to receive XRI Board approval.[21] However, he assured Holifield that Morgan Stanley's goal was not to interfere with his efforts to raise capital

---

[19] *Id.*

[20] *Id.*

[21] *Id.* at 597, 616 (finding that the proposal for Assurance to have a second-position security interest in the Disputed Units "was no longer available after Morgan Stanley refused to approve the pledge.").

for Entia. The trial court credited Holifield's testimony that he believed that Gabriel and Morgan Stanley "were genuinely trying to think through [the situation] to try to figure out how to make something happen."[22]

Holifield then asked Burt if Morgan Stanley would support a loan if he "could set something up where [they] completely isolated the loan . . . without affecting the interest, pledging the interest directly."[23] Burt told Holifield that as long as he kept the arrangement "on [his] side of the ledger," then Morgan Stanley "didn't care."[24] The court found that, "Holifield reasonably understood Burt to be saying that 'effectively, as long as [Holifield] could set up a structure in which there was no direct pledge of the units themselves, and [Holifield] kept all of the risk that was associated with that on [his] side, on the Entia side, then that would be satisfactory.'"[25]

### D. The Structure of the Assurance Loan

After Holifield brainstormed with Gabriel, Assurance, and his lawyers about a structure that would keep the transaction "on his side of the ledger," Holifield concluded that the only structure that would work was one wherein Holifield would borrow the amount personally. This meant that Assurance would not receive any interest in the Disputed Units directly but would instead become a general creditor of Holifield. Under

---

[22] *Id.* at 597.

[23] *Id.*

[24] *Id.*

[25] *Id.* The trial court credited Holifield's testimony about his recollection of conversations with Burt, in part because Morgan Stanley's stance on the topic "makes sense from a business perspective." *Id.* at 597–98.

11

that arrangement, Assurance would not receive any rights in the Disputed Units per se, but if a sale of the units resulted in Holifield receiving money, then Assurance would have a right to that money once it reached Holifield's pocket. Gabriel and Holifield concluded that although "the structure would work under the LLC Agreement," it was unlikely that Assurance would be comfortable with that arrangement. Thus, the question for Holifield was whether there was a way to elevate Assurance's claim to the proceeds from a sale of the Disputed Units above the claims of Holifield's other general creditors, while still maintaining Assurance's status as an unsecured general creditor so as not to threaten XRI's rights in the Disputed Units.

Holifield's lawyers came up with a complex transaction structure intended to resolve this key question. Under their proposal, Holifield would transfer the Disputed Units to a special purpose vehicle ("SPV"), which would then assign all of its rights to the proceeds it received from a sale of the Disputed Units to Entia. Assurance would extend the Assurance Loan to Entia, secured by an all-assets pledge at the Entia level. As a backstop, Holifield and the SPV would guarantee the repayment of the Assurance Loan. Under that structure, the proceeds from a sale of the Disputed Units would first repay XRI in satisfaction of the XRI Note, and the remainder would be transferred to Entia to repay the Assurance Loan.[26] In other words, XRI would continue to be the sole creditor with any security interest, let alone a perfected security interest, in the Disputed Units, while

---

[26] *Id.* at 599–600. This concept was laid out in a May 24, 2018 email from Holifield's counsel to Assurance's counsel. *Id.* at 600.

Assurance would gain a priority in Entia's rights to any net proceeds from a sale of the Disputed Units after full payment of the XRI Loan.[27]

The first step of the transaction, the transfer of the Disputed Units to a SPV, would not, in Holifield's view, require XRI Board consent under the LLC Agreement. The Court of Chancery found that Holifield and his lawyers understood the transfer of the Disputed Units to be a Permitted Transfer under the LLC Agreement, which entitled Holifield to transfer the Disputed Units to a wholly-owned affiliate for purposes of estate planning, without needing XRI Board consent to do so.[28] As discussed below, the Court of Chancery further found that, although the transfer of the Disputed Units in a SPV enhanced Holifield's ability to engage in estate planning, "[i]t is clear . . . that the specific impetus for placing the Disputed Units in an SPV was to facilitate the Assurance Loan."[29] This is because Holifield had not planned to transfer the Disputed Units to an SPV separate and apart from the Assurance Loan, and he never created any formal estate plan. The court found that through this structure, "Holifield and his counsel believed that they would keep the transaction on Holifield's 'side of the ledger,' just as Morgan Stanley wanted."[30]

---

[27] In other words, relative to Holifield's other general creditors, Assurance would have priority in any net proceeds from the sale of the Disputed Units, after full payment of the XRI loan. And relative to XRI, Assurance would remain a junior creditor, and its claim would be unsecured.

[28] The LLC Agreement still required Holifield to send material contracts relating to a Permitted Transfer, including the LLC agreement for Blue, to the XRI Board. *Id.* at 601.

[29] *Id.* at 600.

[30] *Id.*

*E. The Blue Transfer and the Assurance Loan Close on June 6, 2018*[31]

Only "[a]fter coming up with the structure" did Holifield inform Gabriel that he planned to obtain additional capital from Assurance.[32] Holifield also informed Gabriel that he planned to transfer his Disputed Units to Blue (the "Blue Transfer"). Holifield subsequently explained to Burt that he was making the transfer "for estate planning purposes and that he planned to exercise rights available to him under the documents without a request for board approval."[33] However, in connection with any Permitted Transfer, the LLC Agreement required that both the transferring member and the Permitted Transferee "execute documentation reasonably acceptable to the [XRI] Board documenting such Transfer, which may include provisions giving rights of approval with respect to amendments of the governing documents and material contracts (to the extent relating to the relevant Units or other Company Interests) of the Permitted Transferee to the Company."[34] The LLC agreement for Blue was a "material contract" that Holifield would have to provide to XRI in connection with a Permitted Transfer.

Holifield and his advisors carefully considered what language to include in the LLC agreement for Blue. Given that Holifield told Burt that he was making the Blue Transfer for estate planning purposes, not to secure a loan for Entia, the key question was whether

---

[31] A visual representation of the Blue Transfer and Assurance Loan transaction can be found in Exhibit A herein.

[32] *Chancery Opinion*, 283 A.3d at 600.

[33] *Id.* XRI points to this fact as supporting the conclusion that Holifield acted willfully or with gross negligence under the LLC Agreement in effectuating the Blue Transfer, a key issue on cross appeal. Answering Br. at 14, 16, 17 n.2, 30 n.3, 56, 58.

[34] *Chancery Opinion*, 283 A.3d at 601; App. to Opening Br. at A105 (LLC Agreement § 8.01(e)).

14

the agreement should include language documenting that Entia was entitled to receive the net proceeds from a sale of the Disputed Units, after satisfaction of the XRI Loan. According to the trial court, Holifield's counsels' concern was that if such language were included, it would cause Morgan Stanley and XRI to slow down the process with questions on issues that ultimately did not concern them. Accordingly, Holifield and his advisors decided not to include language in the Blue LLC agreement indicating that Entia would receive the net proceeds of a sale of the Disputed Units because, in their view, the transaction did not affect XRI's rights in the units. On May 29, 2018, Holifield's counsel sent an email to Assurance's counsel, copying Ellis, Holifield, and other members of the deal team, explaining this conclusion. She wrote:

> As a practical matter, XRI will only send on the net proceeds to the SPV (*i.e.*, they will keep the $10mm+ to repay their own loan), so there's no real waterfall, only a repayment of the Assurance loan. But if we flag this in the Operating Agreement that Morgan Stanley and XRI have to approve i/c/w the transfer of the equity into the SPV, then we may be inviting trouble with Morgan Stanley. *Remember they said, as long as you keep it on your side of the ledger, [Holifield], we don't care what you do.* So we'd rather not have any mention of the loan or the repayment in the docs that Morgan Stanley approves. Assurance will have a first and exclusive lien on the Entia assets. Any problem with the Operating Agreement providing that the proceeds go to Entia? *[Morgan Stanley] would have no problem with that and then we keep them out of our loan arrangements, which has been the goal from Day 1.*[35]

The Court of Chancery rejected XRI's contention that the foregoing email is evidence that Holifield and his advisors defrauded XRI by withholding information about

---

[35] *Id.* (emphasis in original); App. to Opening Br. at A0159 (Email from Jackie Camp to Craig Lee, CC Gregory Holifield, Seth Ellis, David Jakubs, and counsel, SPV Operating Agreement, May 29, 2018) (emphasis added).

the structure of the Assurance Loan. Instead, it found "that Holifield and his counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's side of the ledger[,]" that "Morgan Stanley did not want XRI to be involved in Holifield's efforts to raise capital[,]" and therefore Holifield and his advisors made a reasonable and good faith decision not to disclose information regarding the structure of the Assurance Loan.[36]

On May 30, 2018, Holifield's counsel sent Holifield an email[37] that would later be circulated to Burt and XRI's lawyers.[38] That email attached a set of proposed documents that would effectuate the transfer of the Disputed Units from Holifield to Blue while preserving XRI's rights as a secured creditor. Those documents were:

1) The formation documents for [Blue].

2) The Contribution and Assumption Agreement wherein [Holifield] transfer[s] [his] XRI interests to [Blue] and, as a condition to that transfer, [Blue] agree[s] to assume the obligations of a Member of XRI, guaranty [sic] the Entia loan and pledge the XRI stock to secure that guaranty.

3) The [Blue] Guaranty and a redline to [the] existing Guaranty of the Entia loan.

4) The [Blue] Pledge Agreement and a redline to [the] existing pledge in support of the Entia loan.[39]

As noted, none of the documents contained language that Entia would be entitled to the net proceeds of the sale of the Disputed Units, after satisfaction of the XRI Note.

---

[36] *Chancery Opinion*, 283 A.3d at 601.

[37] App. to Opening Br. at A0160–61 (Email from Gregory Holifield to Matthew Gabriel, CC David Jakubs and counsel, Transfer of XRI Interests to new SPV, May 30, 2018).

[38] *Id.* at A162–63 (Email from Logan Burt to Matthew Gabriel, Transfer of XRI Interests to new SPV, May 31, 2018).

[39] *Chancery Opinion*, 283 A.3d at 602.

16

Moreover, the email communicated Holifield's counsels' belief that "the transfer of the [Disputed Units] to [Holifield's] new SPV is a transfer to a Permitted Transferee under Section 8.0l(a)(iii) and the definition of Permitted Transferee in the XRI LLC Agreement, and therefore requires no XRI or Morgan Stanley consent."[40] In the email, Holifield's counsel informed him that the email could "be forwarded as is to Matt Gabriel" and was designed "to make it as easy as possible for XRI to expeditiously clear [the transaction]."[41] Thus, Holifield forwarded it to Gabriel, who then forwarded it to Burt with the comment that it seemed "well thought through by counsel."[42] Burt then forwarded the emails to XRI's lawyers and asked to set up a telephone conference to discuss the documents.

A few days later, on June 5, 2018, after conferring with XRI's Board and counsel, Gabriel signed off on the transaction. He wrote to Holifield that based on "*the understanding that the transfer that you are proposing is indeed a Permitted Transfer*, then the consent of [the] Board is not required. Please be advised though that the board consent requirements set forth in the [LLC Agreement] with respect to subsequent Transfers . . . will remain in effect."[43] Further, he wrote that it made sense "to limit the documents that XRI is signing to those for which XRI's signature is strictly required."[44] With this goal in mind, Gabriel asked Holifield to modify the documents:

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* (emphasis added); App. to Opening Br. at A0164–65 (Email from Matthew Gabriel to Gregory Holifield, Transfer of XRI interests to new SPV, June 5, 2018).

[44] *Chancery Opinion*, 283 A.3d at 602.

17

I would kindly request that you please deliver executed copies of the contribution, assignment and assumption agreement (with a provision giving XRI third party beneficiary status), the new guaranty (removing the signature block for XRI), the new pledge (which I will countersign on XRI's behalf as an acknowledgement of receipt), as well as a new financing statement to be filed. Please also confirm when you deliver these documents that your personal guaranty remains in force.[45]

Holifield forwarded this request on to his lawyer, who advised him in an email that "it's ok to sign the 3 XRI docs and get [Gabriel] to countersign the Pledge Agreement. They're all dated tomorrow but *there's no real uncertainty about closing Assurance* and even if it fell through you'd still have an SPV structure which is preferable to you personally."[46] The next day, Holifield forwarded the email from his lawyer, along with updated drafts of each document and a signed copy of the Unit Pledge Agreement under which Blue pledged its ownership interest in the Disputed Units as security for the XRI Loan (the "Blue Pledge"), to Gabriel. The forwarded email included the full email from Holifield's lawyer, including the statement that "there's no real uncertainty about closing Assurance."[47] The trial court found that this demonstrated that neither Holifield nor his counsel was trying to hide the Assurance Loan from XRI. However, the trial court also found that Holifield and his counsel did not disclose the full details of the Assurance Loan: the Blue LLC Agreement did not provide that Blue was required to pay excess proceeds from a sale of the Disputed Units to Entia, and Holifield and his counsel did not send the full set of transaction documents to Gabriel or the XRI Board.

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at 603.

18

On June 6, 2018, Holifield and Assurance effected the interlinked series of transactions resulting in the Blue Transfer and the Assurance Loan through nine documents:

(1) Note Purchase Agreement—the contract establishing the terms of the lending arrangement between Entia and Assurance.

(2) Assurance-Entia Note—the note reflecting Assurance's $3.5 million loan to Entia.

(3) Entia Security Agreement—the agreement securing the Assurance-Entia Note with all of Entia's assets as collateral.

(4) Assurance-Holifield Guaranty—a guaranty by Holifield in favor of Assurance for the Assurance-Entia Note.

(5) Assurance-Blue Guaranty—a guaranty by Blue in favor of Assurance for the Assurance-Entia Note.

(6) Assurance Side Letter—a letter from Assurance to Blue imposing additional restrictions on Blue's use of the XRI Units and giving Assurance the right to any proceeds from a sale of the Disputed Units, if and when received by Blue (the "Side Letter").

(7) Contribution, Assignment and Assumption Agreement—an agreement purportedly transferring XRI Units from Holifield to Blue.

(8) XRI Guaranty–Blue—a guaranty agreement by Blue in connection with the $10.6 million XRI Loan, which Holifield had previously guaranteed personally.

(9) Blue Pledge Agreement—an agreement in which Blue pledged the XRI Units as security for the $10.6 million XRI Loan.

It is undisputed that Holifield provided copies of only the last three documents, in addition to a UCC-1 Financing Statement identifying Blue as the debtor rather than Holifield, to XRI in June 2018. Again, none of these documents contained a key detail of the Assurance Loan, namely, that Assurance had the right to receive any net proceeds that Blue, Entia, or

19

Holifield received in the event of a sale of the Disputed Units, after satisfaction of the XRI Note. Instead, that information was contained in the first six documents, particularly the Side Letter. The trial court credited Holifield's testimony that the idea to give Assurance the right to net proceeds, and not a security interest in the Disputed Units themselves, "came out of the exchanges with [Gabriel]."[48]

In the same June 6, 2018 email in which Holifield sent the three Blue Transfer documents, Holifield wrote: "I confirm that my personal guarantee remains in force. Please provide the countersigned copy of the pledge agreement at your earliest convenience."[49] In all, the Blue Transfer documents ensured that XRI retained all of its rights with respect to the Disputed Units, despite the transfer to Blue. Thereafter, Gabriel countersigned the Blue Pledge on behalf of XRI, the only document that XRI executed. The Blue Pledge made the Disputed Units available to XRI as collateral for the XRI Note. Blue did not make a similar pledge to Assurance in connection with the Assurance Loan.

F. *XRI Learns of the Assurance Loan in April 2019*

Less than a year later, Entia needed additional capital. In early 2019, Entia received two bridge loans from Assurance, without changing the structure of the Assurance Loan. Still, in March 2019, Entia needed yet more capital and Holifield reached out to Gabriel inquiring whether XRI might purchase some of his units. Again, Gabriel directed Holifield to Morgan Stanley.

---

[48] *Chancery Opinion*, 283 A.3d at 604.

[49] *Id.* at 603.

On March 7, 2019, Holifield sent to Gabriel a draft email he intended to send to Burt about his desire to sell his equity in XRI. Gabriel suggested a number of edits, including striking the following sentence: "In conversation about where things stand for me, [Gabriel] mentioned there has been recent interest in Morgan Stanley deploying additional capital."[50] He explained to Holifield: "[i]f it is no difference to you, I would appreciate it if I was left out by name."[51] The trial court noted that this email "provides direct evidence of Gabriel trying to distance himself from Holifield to preserve his relationship with Morgan Stanley."[52]

Discussions with Burt regarding the sale of Holifield's equity in XRI were unproductive — as in 2018, the two could not agree on terms. As a result, Gabriel again considered purchasing some of Holifield's units himself, but his assets were insufficiently liquid. Holifield suggested that Assurance could loan Gabriel the money in a structure similar to that of the Assurance Loan. This is the point in time when Gabriel became concerned that the Blue Transfer and the Assurance Loan violated the LLC Agreement, and he told Holifield that he intended to inform the XRI Board of those concerns. At that point, Gabriel "had not received any specific information in the form of paperwork to be able to form an opinion."[53]

---

[50] *Chancery Opinion*, 283 A.3d at 605.

[51] *Id.*

[52] *Id.*

[53] *Id.*

21

The trial court found "that Gabriel wanted to be on Morgan Stanley's good side, worried about his personal involvement in facilitating the Assurance Loan, and concluded that his own interests were best served by being the one who provided the information to Morgan Stanley."[54] Between March 22 and April 1, 2019, Gabriel sent XRI's outside counsel the emails he received in May and June 2018 from Holifield and Assurance regarding the formation of Blue and the Blue Transfer. Shortly thereafter, on April 12, 2019, XRI's lawyers sent Holifield a letter asserting that the Blue Transfer "may be violative of Section 8.01 of the LLC Agreement, and therefore may be void and constitute breach of such agreement."[55] They also requested all documentation relating to the Assurance Loan and the Blue Transfer.

Thus, "[n]either Holifield nor his counsel provided the Assurance Loan Documents to XRI, until April 2019 when XRI requested them," nearly a year after the Assurance Loan closed.[56] Because the Blue LLC agreement omitted the detail that Blue would pay to Entia the proceeds of the Disputed Units, after satisfaction of the XRI Note, this is the point at which XRI possessed documents that indicated that the Disputed Units were potentially encumbered under the terms of the LLC Agreement.[57] Notably, the Vice Chancellor did

---

[54] *Id.* at 606.

[55] *Id.*

[56] *Id.* at 604.

[57] *See Chancery Opinion*, 283 A.3d at 627–28 (stating that "Gabriel admittedly did not have access at that time [June 2018] to all of the Assurance Loan Documents, but he understood the structure of the Assurance Loan and had assisted Holifield in coming up with the idea," and that, "[a]ssuming for the sake of argument that Gabriel's knowledge was not enough, in April 2019, Gabriel, XRI's lawyers, and the Board gained full knowledge of the Assurance Loan, including all of the Assurance Loan Documents.").

not determine whether the Assurance Loan constituted a breach of a different provision of the LLC Agreement prohibiting encumbrances on membership interests (the "No Encumbrance Provision"),[58] or whether XRI had acquiesced in a breach of the No Encumbrance Provision.

However, the Vice Chancellor rejected XRI's view that Holifield and his counsel deliberately hid the documents from XRI because they knew that the documents violated the LLC Agreement. Instead, the court found:

> that Holifield and his counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's rights and did not require XRI's approval. Equally important, based on Burt's comment to Holifield about keeping any transaction on his side of the ledger and Gabriel's comment about XRI not wanting to sign any documents that XRI was not required to approve, they believed—reasonably and in good faith— that Morgan Stanley did not want XRI to be involved in any capital-raising efforts by Holifield, unless its approval was contractually required. Holifield and his counsel made a good faith decision not to provide documents to XRI that they believed XRI did not want or need to see.[59]

In making this finding, the trial court relied on certain of Gabriel's actions following the closing of the Assurance Loan. The trial court looked to the fact that, on June 13, 2018, Ellis sent Gabriel an email stating "[w]e closed on [Holifield's] loan as you know,"[60] and

---

[58] The No Encumbrance Provision provides:

> Notwithstanding the foregoing or any other provision of this Agreement, no Member shall pledge, borrow against, collateralize, otherwise encumber or allow any Liens to exist on any of the Units or Company Interests except (x) with the written consent of the Board or (y) in connection with a pledge of Units to the Company as collateral to secure such Member's obligations under a promissory note or guarantee of indebtedness to the Company approved by the Board.

App. to Opening Br. at A0104 (LLC Agreement § 8.01(a)).

[59] *Chancery Opinion*, 283 A.3d at 604.

[60] *Id.*

in response, Gabriel did nothing. He did not ask follow-up questions or ask for documents. Nor did he inform Burt, the XRI Board, or XRI's counsel that the Assurance Loan had closed.[61]

Moreover, the trial court found that, over the months following the transaction, Gabriel emphasized his role in securing the Assurance Loan to convince Holifield to restore the equity interest in Entia that he had sold to Holifield for a nominal value. On August 24, 2018, after a series of discussions, Gabriel sent the following email to Holifield:

> As you know, I sent an email on April 6th proposing the assignment of my ownership interest in certain companies to you. As my cover email to the assignment suggested, I was doing this with the intent of giving you more flexibility to raise additional funds—as it appeared it was necessary for the long-term survivability of the broader set of entities. At the time, you were specifically looking at a capital raise / debt from a group out of New York— the terms of which were not completely transparent . . .. *In the end, however, with my assistance, you were able to move in a different direction and pull in capital from a different source on more appropriate terms.* As we have since discussed by phone multiple times, neither of us in the end believes assigning my interest is the appropriate course of action and our mutual intent [is] to ignore and rescind any prior assignment and continue with our partnerships as previously conducted. Please confirm this is how you see it as well.[62]

As a result, Gabriel recouped his interests in Entia and its portfolio companies.

Holifield testified that he was surprised by the April 12 letter from XRI's counsel requesting the Assurance Loan documents because he was under the impression that Gabriel had been involved in the transaction, that XRI and Morgan Stanley knew about the

---

[61] Instead, the court found that "Gabriel was already in the loop about the Assurance Loan and understood what was going on." *Id*.

[62] *Id.* at 604–05; App. to Opening Br. at A0382 (Email from Matthew Gabriel to Gregory Holifield, Previous Assignment Discussions, Aug. 24, 2018).

transaction, and that he had effectuated Morgan Stanley's wishes by keeping the transaction on his side of the ledger. In any event, Holifield and his counsel sent the requested documents to XRI's lawyers, representing in an email that the Blue Transfer complied with the LLC Agreement. After reviewing the Assurance Loan documents between April 18 and May 6, 2019, XRI's lawyers formed "a strong opinion" that the Assurance Loan was "a violation" of the LLC Agreement.[63] Accordingly, on May 6, 2019, they informed Holifield that XRI was continuing "to review the situation to determine the extent to which Mr. Holifield has breached his ongoing obligations" and was renewing its reservation of its rights,[64] which XRI initially asserted in June 2018.[65] The Court of Chancery discounted both of XRI's reservation of rights letters as "stock language."[66]

---

[63] *Id.* at 606.

[64] *Id.* The letter reserving XRI's rights stated:

> The Company continues to review the situation to determine the extent to which Mr. Holifield has breached his ongoing obligations. The foregoing is not intended to be a complete statement of the facts or circumstances giving rise to the Company's rights, claims and position in this matter, all of which are expressly reserved, including, but not limited to, the Company's right to redeem the Class B Units, foreclose on the Secured Promissory Note in favor of the Company, seek additional information under Section 4.01 of the Unit Pledge Agreement among Entia, LLC as Borrower in favor of the Company as Secured Lender, seek specific performance of Mr. Holifield's obligations and/or an injunction to prevent any unlawful conduct, as well as damages and attorneys' fees, and any other rights to which the Company may be entitled, whether under any contract, at law, or at equity.

App. to Opening Br. at A0389 (Letter from Margaret Hope Allen, Sidley Austin LLP, to Monica J. Washington Rothbaum and Gregory A. Holifield, Entia LLC (May 6, 2019)).

[65] *Chancery Opinion*, 283 A.3d at 628 n. 28; App. to Opening Br. at A0176 (Letter from Matt Gabriel to Greg Holifield (June 5, 2018)) ("XRI expressly reserves all of its rights under the XRI LLC Agreement, including if the proposed Permitted Transferee is not a Permitted Transferee or ceases to be a Permitted Transferee.").

[66] *Chancery Opinion*, 283 A.3d at 628. Specifically, the Vice Chancellor found that "[o]n the facts presented, XRI's Glomar responses do not outweigh the evidence of acquiescence. XRI sent

25

XRI did not take any further action for eighteen months. The trial court rejected as incredible Gabriel's explanation for this delay, that XRI's review "stayed in a nonconclusive state" for the next eighteen months. Instead, the Court of Chancery found that: "In reality, Morgan Stanley decided that the matter was not worth pursuing."[67] It noted that Burt candidly conceded: "[W]e had made a business judgment that it wasn't worth the hassle and legal expense to clarify a position that the company didn't need to clarify."[68] It was not until after Holifield defaulted on the XRI Loan, later in 2020, that XRI asserted that the Blue Transfer was void.

### G. Entia Defaults on the XRI Loan in August 2020

Meanwhile, Entia continued to struggle financially. Even after receiving an additional $472,081.94 loan from Assurance, by the end of 2019, Entia was unable to pay its debts as they came due and at least seven lawsuits had been filed against the entity and Holifield for unpaid debts. The XRI Loan was scheduled to mature on August 8, 2020. Concerned about Entia's ability to pay its debt on that date, Burt and Holifield discussed a possible restructuring or refinancing of the XRI Loan. However, talks broke down after Burt expressed his view that if Entia and Holifield defaulted, XRI could levy on the

---

letters containing stock language, while at the same time doing nothing in the face of Holifield's clear position that the Blue Transfer was valid." *Id.*

[67] *Id.* at 606.

[68] *Id.* (citing Burt Trial Test. at 54:17–20). However, we note that Burt further testified that the reason XRI waited until October 2020 to express its determination that the Blue Transfer was invalid was because "it was the first time that there was kind of a catalyst or a reason to take a position on it. Prior to that time, if it was impermissible, it was voided." App. to Opening Br. at A0637 (Burt Trial Test. at 54:14–17).

Disputed Units. Holifield disagreed with this view, making clear to Burt that XRI could not take the units without paying him a fair market price.

Holifield defaulted on the XRI Loan when it came due on August 8, 2020. On August 12, XRI lawyers sent Holifield a letter via email notifying him of the default. Relevant to the subsequent notice of foreclosure, the physical address that appeared in the letter was the address for notice found in the XRI Note — a building in Lake Mary, Florida. That building was previously owned by Gabriel and Holifield and was used as Entia's headquarters. As Gabriel knew, they had sold the building and Entia had vacated it eight months earlier in January 2020.

Having received the letter via email, Holifield responded with the address for his home in Eustis, Florida, and Entia's office in Sanford, Florida. Moreover, in his response, Holifield protested XRI's effort to foreclose on the units without taking commercially reasonable steps. Specifically, he responded:

> Based on recent financial performance of XRI Investment Holdings LLC, it is clear that the value of the [Disputed Units] far exceeds the amount of secured debt. Accordingly, I am writing to request your cooperation in a reasonable marketing and sale process so that the actual value of the [Disputed Units] can be realized. Please contact me at your earliest convince [sic] so that we may discuss the terms of a forbearance so that a marketing and sale process can be undertaken as soon as possible.[69]

The letter referenced the UCC and stated: "To the extent that you seek to exercise remedies and dispose of [the Disputed Units], I expect that you will comply with all applicable requirements of the Uniform Commercial Code, including the requirement to

---

[69] *Chancery Opinion*, 283 A.3d at 607.

conduct such sale in a commercially reasonable manner."[70]  XRI did not respond to Holifield's letter.  At trial, Gabriel testified that a sale process would be damaging to XRI and accordingly, XRI did not view a sale process as reasonable or viable.

*H. XRI Purports to Engage in a Strict Foreclosure in October 2020*

In October 2020, the XRI Board—minus Holifield—decided that the Blue Transfer was invalid and that XRI would engage in a strict foreclosure of the Disputed Units.  There are no contemporaneous documents memorializing this decision, and Holifield was not informed of the XRI Board's decision, despite still being an XRI Board member.

Under Section 9-620 of the Uniform Commercial Code (UCC), a strict foreclosure is a consensual transaction, effectuated through an agreement reached between the secured creditor and the debtor after a default.[71]  However, the UCC deems a non-consumer debtor, such as Holifield, to have consented to a strict foreclosure if the secured creditor makes an unconditional proposal to the debtor to accept the collateral in full satisfaction of the loan and the debtor fails to respond within 20 days after the proposal is sent.

On October 16, 2020, XRI made a proposal to Holifield to accept the Disputed Units in full satisfaction of the XRI Note.[72]  It did so through a letter sent by Federal Express to

---

[70] *Id.*

[71] XRI argued below that New York law governed the strict foreclosure.  Accordingly, the Vice Chancellor's summary of UCC § 9-620 is based on New York's version of the UCC.  *Id.* at 591 n.1.

[72] As the Vice Chancellor found, "[t]o the extent XRI can defend the strict foreclosure, then Morgan Stanley and Gabriel capture proportionate shares of any excess value through their ownership interests in XRI," and "[t]heir gain, of course, comes at Holifield's expense."  *Id.* at 610.

Holifield at the defunct Lake Mary address. Unlike the August 12 letter notifying Holifield of the default, XRI did not send a copy of the proposal to Holifield via email. It did not attempt to provide Holifield with notice at any other address, including either of the addresses that Holifield had provided in his response to the August 12 default letter.

At the time, Holifield was in San Diego, California, and accordingly, never received the Federal Express letter. He did not sign the delivery confirmation.[73] In any event, as Gabriel knew, and as noted earlier, the building in Lake Mary had been sold in early 2020 and was unoccupied on October 16.

On November 30, 2020, XRI sent another letter to Holifield. This time, XRI sent a copy via email. The letter notified Holifield that because he "did not timely object or respond" to the October 16 proposal, XRI had accepted the Disputed Units in satisfaction of the XRI Note. The same day, XRI sent a letter to Holifield removing him from the XRI Board. It sent the removal letter to Holifield via email, copying his counsel, and sent it to his correct home address.

Holifield responded two weeks later, on December 15, 2020. On behalf of Blue, Holifield objected to the strict foreclosure as being "invalid and void."[74] This was because Blue owned the Disputed Units, not Holifield, and Blue had not received a proposal, nor agreed to a proposal. Holifield further explained that he had never received the October

---

[73] The delivery confirmation has the handwritten letters C19, which under FedEx's policies means the package was not signed due to Covid-19. *Id.* at 608.

[74] *Id.*

29

16 proposal because XRI deliberately sent it to a defunct address and failed to send it to him via email, as it had done in the past.

Three days later, on December 18, XRI responded to Holifield's objection via email. In this letter, XRI definitively asserted for the first time that the Blue Transfer was invalid. Thus, in XRI's view, Holifield remained the owner of the Disputed Units at the time XRI sent the proposal, and therefore, the proposal had been validly delivered. This meant that the strict foreclosure was valid and had resulted in XRI owning the Disputed Units, the elimination of Holifield's Class B membership interest, and the zeroing out of Holifield's capital account, which had a positive balance of $20 million.

## I. The Resulting Litigation

Seven months after the purported strict foreclosure, on June 18, 2021, Assurance filed suit in Texas state court, seeking a declaratory judgment that the foreclosure was invalid.[75] XRI responded by filing the underlying action in the Court of Chancery on July 19, 2021, seeking a declaration that the Blue Transfer was void from the outset. Such a declaration would allow XRI to return to court in Texas and argue that they had properly proceeded against Holifield because he had always owned the Disputed Units as a matter of law.[76]

---

[75] *Assurance Mezzanine Fund III, L.P. v. XRI Inv. Hldgs. LLC*, No. 2021- 36737 (269th Dist. Ct. Harris Cnty., Tex. June 18, 2020); App. to Answering Br. at B0629–48 (Texas Action Original Petition).

[76] On October 27, 2021, XRI amended its complaint to drop Assurance from the lawsuit and add Blue as a defendant. *Chancery Opinion*, 283 A.3d at 609.

30

The Court of Chancery declined Holifield's motion to stay the action in favor of the Texas Action, and the matter proceeded to a one-day trial on June 15, 2022. After the conclusion of the trial, XRI and Assurance settled the Texas Action. Nevertheless, Holifield and XRI insisted that a determination of who owns the Disputed Units was critical and would affect any future litigation over the validity of the strict foreclosure.[77] The Vice Chancellor issued his memorandum opinion in favor of XRI on September 19, 2022. This Court heard oral argument on June 28, 2023.

## J. The Trial Court's Decision

In its September 19 memorandum opinion, the Court of Chancery found that the Blue Transfer did not meet the Permitted Transferee Exception found in Section 8.01 of the LLC Agreement. This is because, in the trial court's view, Holifield failed to prove that Blue met one of the requirements for a Permitted Transferee as of June 6, 2018. That requirement was that the transfer to Blue be made "without consideration."[78] Because the Blue Transfer was made to induce Assurance to make the Assurance Loan to Entia, the trial court found that the transfer was made for consideration.[79] Accordingly, the Blue

---

[77] The trial court found that the record supported Holifield's testimony that "the value of the Disputed Units was $40 to $50 million, net of approximately $12.3 million in principal and interest that he owed on the XRI Note." *Id.* at 610.

[78] *Id.* at 614. Finding that the Blue Transfer was made for consideration, the trial court did not determine whether the Blue Transfer met a third requirement, which the court referred to as the "Exclusive Authority Requirement."

[79] *Id.* Specifically, the court found that:

> Holifield failed to prove that the Blue Transfer complies with the second requirement, namely that the Blue Transfer was "made without consideration" (the "Without Consideration Requirement"). He failed to make the necessary showing because XRI proved that the Blue Transfer must be considered as part of the

31

Transfer was required to be approved by the XRI Board, and because it never was, it was invalid. The implication for the parties' underlying dispute is that the strict foreclosure notice sent by XRI was properly delivered to Holifield, and not Blue, as the owner of the Disputed Units.

In concluding that the Blue Transfer violated the No Transfer Provision, the trial court declined to reach another issue raised by XRI: whether the Blue Transfer violated the No Encumbrance Provision — another provision in Section 8.01 of the LLC Agreement that prohibits members from placing any form of encumbrance on their member interests. The Vice Chancellor did not reach this "close" question because any breach of the No Encumbrance Provision would be "cumulative."[80]

At trial, Holifield asserted the equitable defense of acquiescence — arguing that XRI acquiesced in the Blue Transfer and therefore, its claim of breach was barred under the court's equitable principles. The Court of Chancery found that Holifield had proved the elements of that equitable defense. In other words, XRI participated in and acquiesced in the Blue Transfer, and, at all times, Holifield, reasonably and in good faith, believed that the Blue Transfer was valid and had been approved by XRI. Accordingly, but for our statement regarding contractual incurable voidness in *CompoSecure II*,[81] the Court of

---

Assurance Loan under the step-transaction doctrine, meaning that the Assurance Loan provided consideration for the Blue Transfer.
*Id.*

[80] *Id.* at 610.

[81] 206 A.3d at 816–17.

Chancery would have found that the doctrine of acquiescence applied, XRI's claim to relief was barred, and that the Blue Transfer was valid.

In response to Holifield's acquiescence defense, XRI argued that: (1) "a court of equity cannot consider equitable defenses when the plaintiff has asserted a claim at law," and (2) under *CompoSecure II*, when parties to an LLC Agreement use the word "void" to specify the consequences of breach, then they have agreed that the noncompliant act is void *ab initio*. The Court of Chancery rejected XRI's first argument as to why the court could not consider acquiescence as a defense,[82] but accepted the second argument.[83]

The trial court found that:

> [u]nder the reasoning of [*CompoSecure II*], if parties to a contract specify that a noncompliant act is "void," then the act is void *ab initio* with all of the consequences attendant to that status under the common law. Pertinent to this litigation, that means a party may not deploy equitable defenses such as waiver, estoppel, acquiescence, or unclean hands to defeat the claim of breach and defend the contractually noncompliant act. In short, the act is incurably void.[84]

In other words, the Court of Chancery interpreted our decision in *CompoSecure II* to mean that "when an agreement states that a noncompliant act is 'void,' then the plain language of that provision trumps the common law and requires that a court deem the act void *ab*

---

[82] The trial court expressed its view that "whether a party can raise an equitable defense in response to a legal claim depends on the equitable defense." *Chancery Opinion*, 283 A.3d at 629. The Vice Chancellor concluded that "Delaware decisions recognize the availability of acquiescence to claims at law." *Id.* at 641. This conclusion is not challenged on appeal.

[83] *Id.* at 622 ("Holifield proved at trial that acquiescence applies, making it necessary to reach XRI's legal arguments. XRI's first contention is misguided, but its second contention finds support in *CompoSecure II*, a binding Delaware Supreme Court precedent. The Blue Transfer is therefore incurably void, and acquiescence cannot save it.").

[84] *Id.* at 641–42.

33

*initio*."[85]  The trial court further noted that the Court of Chancery recently expressed the

same view in *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs. Inc.*[86]

(a case pre-dating *CompoSecure II*) and in *Absalom Absalom Tr. v. Saint Gervais LLC.*[87]

Although the trial court agreed that it was bound by our holding in *CompoSecure II*,

it found the outcome to be "uncomfortable" and "inequitable."  And after it expressed the

view that our decision was not wrong, but rather, was "one possible approach," it proposed

a different and "preferable" approach, in lengthy dictum:[88]

> Under that different approach, the consequence of incurable voidness would
> be reserved for acts that violate limitations that the state has imposed, in its
> capacity as sovereign, on the actions that parties can legitimately take. When
> parties have gone outside the boundaries that the state has set, it makes sense
> that the state would treat the impermissible act as if it never occurred.  But
> just as parties cannot agree contractually to other remedies that only the state
> can impose, such as criminal sanctions, parties would not be able to agree
> contractually to an outcome of incurable voidness.  No matter what words
> the parties used in a contract, the noncompliant act would be voidable, not
> void.  A court still could determine that the act was invalid, but parties would
> be able to raise equitable defenses to defeat that result.  Parties could not use
> the word "void" to contract out of equity.[89]

---

[85] *Id.* at 644.

[86] 2018 WL 658734, at *2 (Del. Ch. Feb. 1, 2018) (holding that a transfer of a member interest in an LLC was incurably void when made without the prior written unanimous consent of the managers, because the LLC agreement stated that any noncompliant transfer was "null and void").

[87] 2019 WL 2655787, at *1 (Del. Ch. June 27, 2019) (holding that, under *CompoSecure II*, the transferring member could not invoke the equitable defense of laches, waiver, equitable estoppel, ratification, and acquiescence to defeat the claim of breach).

[88] *Id.* at 647 ("The discussion of an alternative direction is admittedly dictum.  It represents one trial judge's suggestion regarding a preferable approach.").

[89] *Id.* at 645–46.

The Vice Chancellor's approach is based on the following considerations: (1) authorities that pre-dated *CompoSecure II*;[90] (2) the limited instances in which courts historically have deemed acts void *ab initio*[91] and the significant consequences of determining that an act is void *ab initio*;[92] (3) contractual principles under which parties generally cannot constrain the remedial flexibility of a court or insulate their agreement from the effects of their subsequent conduct; (4) the lack of consistency in how courts, legislators, and parties have used the term "void" and similar terms (*i.e.*, void, void *ab initio*, voidable, invalid, ineffective, without effect); and (5) the Delaware Constitution's guarantee of a court to administer the remedies and principles of equity. The Vice Chancellor's dictum forms the basis of Holifield's appeal.[93]

---

[90] *Id.* at 648–50. The trial court discussed the following cases, which this opinion addresses below: *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95 (Del. Ch. 2006); *Genger v. TR Invs., LLC*, 26 A.3d 180 (Del. 2011); *Paul v. Chromalytics Corp.*, 343 A.2d 622 (Del. Super. 1975).

[91] The Court of Chancery observed that "[t]hose instances involve situations where the parties exceeded the bounds of the authority conferred by the state, not where they breached a private contractual agreement." *Chancery Opinion*, 283 A.3d at 646.

[92] *Id.* at 651–58. The Vice Chancellor grouped these together as considerations based on the law governing voidness. He stated:

> A second set of considerations takes into account two takeaways from the law governing voidness. The first is that courts have limited the situations in which an act will be declared incurably void as a result of violations of positive law or fundamental public policy; in other words, limitations imposed by the state in its capacity as sovereign. The second is that the consequences of determining an act "void *ab initio*" are inflexible, far-reaching, and often harsh.

*Id.* at 651.

[93] The Vice Chancellor also identified a statement he had made in a previous decision, that he now considers to be incorrect. The statement, made in *Klaassen v. Allegro Dev. Corp.*, is: "[T]raditionally, when a board took action in contravention of a mandatory bylaw, the board action was treated as void." (*Klaassen I*) 2013 WL 5739680, at *19 (Del. Ch. Oct. 11, 2013), *aff'd*, (*Klaassen II*), 106 A.3d 1035 (Del. 2014).

*K. Contentions on Appeal*

    *1. Holifield's Contentions*

Holifield sets forth two contentions on appeal. Each concerns the trial court's interpretation and application of this Court's decision in *CompoSecure II*. Holifield does not challenge the Court of Chancery's finding that, under the plain language of Section 8.01 of the LLC Agreement, the Blue Transfer is invalid. Instead, he argues that the Court of Chancery should have been free to consider Holifield's acquiescence defense and, given the court's finding that Holifield proved the elements of acquiescence, rule in his favor.

*First,* Holifield urges this Court to either distinguish or overturn certain aspects of *CompoSecure II*. Specifically, Holifield advocates for the rule proposed by the Vice Chancellor: that the principle of incurable voidness recognized in *CompoSecure II* ought to be reserved for illegitimate acts that violate limits imposed by the state, as sovereign. He argues that, despite the Delaware Limited Liability Company Act (the "LLCA") and the deference Delaware courts give to private ordering in LLCs, Delaware courts retain an inherent measure of authority and oversight in Delaware contract relations — one that is supplemented by principles of law and equity — and one that trumps even the maximized outer bounds of contractual freedom. Ultimately, Holifield argues that equity must prevail, and parties should not be rewarded for acting inequitably.

In the alternative, Holifield argues that, even if this Court upholds *CompoSecure II*, it should find that *Absalom* went too far in stating that *CompoSecure II's* "logic extends to

other equitable defenses," beyond ratification, the defense at issue in *CompoSecure II*.[94]

Thus, even if *stare decisis* supports upholding *CompoSecure II*, as XRI argues, the doctrine does not support the extension of *CompoSecure II* that the Court of Chancery adopted in *Absalom*.

*Second*, Holifield argues that the trial court erred by applying the principle of incurable voidness announced in *CompoSecure II* to the contractual language at issue in this case — "shall be void."  Instead, Holifield argues, the trial court should have required a more specific and emphatic contract language formulation — as in *CompoSecure II* ("void and of no force or effect whatsoever"), *Absalom* ("null and void"), and *Southpaw* ("null and void *ab initio*").  Specifically, Holifield suggests this Court require the phrase, "null and void *ab initio*," to be used to signify contractually specified incurable voidness so that the doctrine could be consistently and predictably applied.[95]

### 2. XRI's Contentions

XRI sets forth five arguments in response to Holifield's urging that this Court overrule *CompoSecure II*.  *First*, XRI argues that *CompoSecure II* and *Absalom* are a straightforward application of the strong contractarian policies embedded in Delaware law generally, and in Delaware LLC law particularly.  Moreover, XRI contends that

---

[94] Opening Br. at 24 (quoting *Absalom*, 2019 WL 2655787, at *4).

[95] *Id.* at 40–41.  Holifield argues that the word "void" on its own does not clearly and unambiguously provide for incurable voidness.  In a footnote in his opening brief and in the body of his reply brief, Holifield notes that "it is now settled in this court that the removal of default fiduciary duties through an LLC agreement must be accomplished with clear and unambiguous language," and suggests we require the same clarity where parties contract for incurable voidness.  Opening Br. at 40.  Because Holifield did not raise the argument in the body of his opening brief, it is waived.  Supr. Ct. R. 14(b)(vi)(3).

enforcement of incurable voidness here aligns with the Delaware policy that members of an LLC be able to pick their partners and prevent strangers from gaining a stake in the enterprise.

*Second*, XRI notes that the General Assembly adopted Section 18-106(e) of the LLCA in 2021 to address *CompoSecure II* and *Absalom*, but that the amendment does not apply to a breach committed by an LLC's members or provide the Court of Chancery with authority to validate void acts. XRI argues that, by letting *CompoSecure II* stand in relevant respect, the legislature has given parties to an LLC agreement the power to determine which of the LLC's or its members' breaching acts are void, and this Court should not second-guess that decision.

*Third*, XRI emphasizes that neither the trial court nor Holifield give "urgent reasons" or demonstrate a "clear manifestation of error" as is required to overrule precedent.[96] Further, XRI contends that none of the factors counseling overruling precedent are in play here — no decision of this Court conflicts with *CompoSecure II*, *CompoSecure II* is only five years old, the case articulates a straightforward rule, and the General Assembly has provided a narrow avenue around the contractual voidness provisions for one party (the LLC) through one remedy (ratification).

*Fourth*, XRI asserts that this case is a poor vehicle for reconsidering *CompoSecure II* because this case is only a prelude to another lawsuit, one that has yet to be filed. Therefore, there is no equity to be championed in this case. Even if there were, XRI

---

[96] Answering Br. at 40 (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 124 (Del. 2006)).

contends, the equities weighed stronger in *CompoSecure II* itself.  And despite this, this Court there held that the parties' agreement provided for incurable voidness.  *Finally*, XRI contends that Delaware recognizes that equity is not a tool for avoiding contractual commitments, and it should not be used as such in this case.

In response to Holifield's second argument on appeal — that Delaware courts should require additional, emphatic language, before finding that a provision renders a noncompliant act incurably void — XRI argues that the argument is waived because no one in the proceedings before the Court of Chancery, or this Court, has argued that the word "void" in the LLC Agreement is ambiguous.

## L.  XRI's Cross-Appeal

### 1.  XRI's Cross-Appeal Contentions

On cross-appeal, XRI claims that the trial court erred in dismissing XRI's breach of contract claim seeking to recover (1) amounts it expended in litigating against Assurance in the Texas Action, and (2) amounts advanced to Holifield as an LLC member.  The trial court dismissed the claim for damages because it found that XRI failed to preserve it, and because the finding of acquiescence would bar XRI's recovery as to both amounts.  On cross-appeal, XRI argues that XRI raised each issue in the operative complaint[97] and in

---

[97] App. to Answering Br. at B0005 (First Amended Verified Complaint ¶ 13) ("XRI also seeks damages against Holifield resulting from his breach of the express terms of the XRI Company Agreement."), B0026 (First Amended Verified Complaint ¶ 113) ("As a proximate result of Holifield's breach, XRI has incurred damages in an amount to be determined at trial."), B0029 (First Amended Verified Complaint, Prayer for Relief (iii)) (requesting an order awarding damages, prejudgment interest, and costs, including attorneys' fees incurred in bringing this action).

post-trial briefing and argument,[98] that its failure to present evidence of the amount of damages cannot be faulted because at that point, the Texas Action was ongoing and Holifield was continuing to incur legal expenses in this case, and that Holifield has never argued that XRI waived the claim. Further, XRI contends that the trial court's ruling that XRI's acquiescence bars recovery is erroneous and contravenes *CompoSecure II*.

As to the recoupment of Holifield's legal fees, under the LLC Agreement a judicial finding of "gross negligence or willful breach" entitles XRI to recoupment.[99] The trial court did not address this standard, and XRI argues that the trial court's acquiescence finding is not a substitute. Instead, XRI contends that the trial court's finding that Holifield misrepresented to XRI that he was making the Blue Transfer "for estate planning purposes" while knowing that the real impetus for the transfer was to facilitate the Assurance Loan, constitutes a willful breach of the No Transfer Provision.

XRI further argues that Holifield willfully breached the No Encumbrance Provision and his confidentiality obligations under the LLC Agreement.[100]

---

[98] *Id.* at B0205–06 (Plaintiff's Post-Trial Brief at ¶ V.B.) (seeking relief in the form of damages "equal to the costs of defending and resolving the Texas Action" and "the sums advanced to Holifield"); B0276 (Post-Trial Oral Argument Transcript at 69) (seeking damages for Texas Action and recoupment of expenses advanced to Holifield).

[99] App. to Opening Br. at A0090 (LLC Agreement § 4.07(a)), A0093–94 (LLC Agreement § 5.04(a)).

[100] XRI argues that in order to obtain one of the bridge loans, Holifield improperly provided Assurance with XRI documents, including a board package and financial statements and projections, all of which violated the confidentiality provision in the LLC Agreement. Unlike the argument regarding breach of the No Encumbrance Provision, XRI did not plead an independent confidentiality breach in its complaint or at trial, and, accordingly, the trial court did not make factual findings related to the issue. *See, e.g.*, App. to Answering Br. at B0269 (Transcript of Post-Trial Oral Argument at 62:2–5, dated July 8, 2022) ("We have not pled an independent confidentiality breach, but we think that this is further evidence of Mr. Holifield's state of mind

XRI urges this court to, at a minimum, remand the case to the trial court to determine: (1) the amount of breach of contract damages to which XRI is entitled for its expenditures in the Texas Action, and (2) whether, under the terms of XRI's LLC Agreement, Holifield acted willfully or with gross negligence in breaching the agreement.

### 2. *Holifield's Response on Cross-Appeal*

In response to XRI's cross-appeal arguments, Holifield asserts that the trial court properly determined that XRI is entitled to neither a damages award nor recoupment of its legal expenses. *First*, Holifield contends that XRI's proffered reason for not providing an amount of damages to the trial court is insufficient. The Texas Action was settled six days after trial concluded in this litigation, on June 21, 2022, and yet XRI did not communicate a number in any post-trial briefing. *Second*, Holifield argues that the trial court's factual findings underpinning its acquiescence finding are entitled to deference and support a finding that any recovery to XRI is barred. Moreover, the trial court repeatedly found that Holifield acted reasonably and in good faith, a finding entitled to deference, that precludes a finding that Holifield acted willfully or with gross negligence in breaching the agreement.

### II. SCOPE AND STANDARD OF REVIEW

"We review questions of law and contractual interpretation, including the interpretation of LLC agreements, *de novo*."[101] "Since the parties do not challenge the

---

with respect to the breach of the company agreement."). We, likewise, do not consider the confidentiality issue on appeal.

[101] *CompoSecure II*, 206 A.3d at 816 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

41

relevant factual findings on appeal, the issues before us involve legal questions or issues of contractual interpretation, which we review *de novo*."[102]  With respect to whether a party has preserved an issue on appeal, we will independently examine "the record below."[103]

## III.  ANALYSIS

A. *CompoSecure II Was Correctly Decided, And We Decline to Modify It Beyond the General Assembly's Statutory Amendment*

### 1.  *CompoSecure II*

The *CompoSecure* litigation involved a sales agreement entered into by CompoSecure, L.L.C. ("CompoSecure") and CardUX, LLC ("CardUX") ("the Sales Agreement").  CompoSecure is a manufacturer of metal payment cards.  It formed CardUX to promote sales of CompoSecure's metal cards by convincing brand partners (*e.g.*, Amazon) to demand metal cards from their partnering banks.  The Sales Agreement memorialized the relationship between the two entities.  It provided that CardUX was entitled to a 15 percent commission on sales to a list of "Approved Prospects" without requiring CardUX to establish any connection between its efforts and a sale to earn a commission.  This provision created situations in which either side might receive a windfall, as CompoSecure also would not have to pay a commission for any sale to a non-Approved Prospect, even if CardUX's efforts contributed to the sale.  After the parties entered into the Sales Agreement, CompoSecure finalized a highly profitable order with Amazon, without the aid of CardUX.  In fact, despite CardUX's "help in steering the

---

[102] *Id.*

[103] *Id.* at 810.

business to Bank of America," "Amazon had already agreed to a partnership with Chase by the time CardUX met with Amazon representatives."[104]  However, despite its lack of involvement in securing the Amazon deal, under the Sales Agreement CardUX was entitled to a commission.

Seeking to extricate itself from the obligation to pay CardUX, CompoSecure argued that the Sales Agreement violated a provision in its LLC agreement.  That provision, the "Restricted Activities Provision," provided that certain company activities required CompoSecure board and investor approval.  Importantly, the LLC agreement further provided that "any action taken in contravention of [those requirements] *shall be void and of no force or effect whatsoever*."[105]

This Court found that if the Sales Agreement qualified as a Restricted Activity, then under the plain language of the Restricted Activity Provision, the Sales Agreement was void and therefore, incapable of ratification.  Specifically, this Court stated:

> We agree that, if the Restricted Activities Provision were to apply, *the plain language of the provision would render the Sales Agreement void, and therefore incapable of being ratified*.  The common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses.  Ordinarily, the Sales Agreement would be voidable for failure to comply with the Restricted Activities Provision. *But, given the plain language of the Restricted Activities Provision—"void and of no force or effect whatsoever"—its application would trump the common law rule and render the Sales Agreement void and incapable of being ratified.*[106]

---

[104] *Id.* at 815.

[105] *Id.* at 814 (emphasis added).

[106] *Id.* at 816–17 (internal footnotes omitted) (emphasis added).  On remand, the trial court found that the Restricted Activities Provision did not apply.  *CompoSecure III*, 2019 WL 2371954. Thereafter, we affirmed.  *CompoSecure IV*, 213 A.3d 1204.

For the reasons set forth below, we decline Holifield's and the Court of Chancery's request that we reconsider this decision.

### 2. LLCs are Primarily "Creatures of Contract"

This Court's holding in *CompoSecure II* is grounded in the notion that LLCs are "creatures of contract."[107] This oft-repeated phrase flows from the Delaware General Assembly's policy judgment regarding freedom of contract in the LLC context, as evinced in the LLCA. The LLCA provides "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[108] Thus, this Court has observed that the approach of the LLCA is "to provide members with broad discretion in drafting the [limited liability company agreement] and to furnish default provisions when the members' agreement is silent."[109]

Accordingly, the LLCA allows parties to an LLC agreement contractual freedoms not available in the corporate context. For one, as Holifield, Gabriel, and Morgan Stanley did in the LLC Agreement,[110] parties to an LLC agreement may contractually disclaim fiduciary duties of members and managers, so long as they do so clearly and

---

[107] *See, e.g.*, *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1259–60 (Del. 2016) (citing *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members.").

[108] 6 *Del. C.* § 18-1101(b).

[109] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999).

[110] App. to Opening Br. at A0090 (LLC Agreement § 4.07(a)) (disclaimer of fiduciary duties of representatives); *Id.* at A0091 (LLC Agreement § 4.07(d)) (disclaimer of fiduciary duties of members).

44

unambiguously.[111]  Another example is the pronouncement in Section 18-306 and Section 18-502(c) of the LLCA, that an LLC agreement may specify remedies for breach of the agreement by a member, or a manager, including equitable remedies, such as specific performance.[112]

Accordingly, this Court has observed, most recently in *Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP* in the context of Delaware limited partnerships,[113] that "the doctrine of caveat emptor . . . is fitting" in the alternative entity context.[114]  This is because investors in alternative entities willingly invest in such entities, despite the fact that the entities have "fewer protections . . . than those provided under corporate fiduciary duty principles."[115]  Thus, we have warned that investors in alternative entities must read the entity's constituent documents carefully to understand their rights,

---

[111] 6 *Del. C.* § 18-1101(c), (e); *see, e.g.*, *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (observing that "[t]he LLC Act is explicitly contractarian," and that "in the context of construing LLC agreements, this Court has recognized that '[a]lthough fiduciary duties may be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive.'") (quoting *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014))).

[112] 6 *Del C.* § 18-306, 18-502(c).

[113] The observations regarding Delaware limited partnerships are applicable to Delaware limited liability companies.  *See Jaffari*, 727 A.2d at 290 ("The Delaware Act has been modeled on the popular Delaware LP Act.  In fact, its architecture and much of its wording is almost identical to that of the Delaware LP Act.  Under the Act, a member of an LLC is treated much like a limited partner under the LP Act.  The policy of freedom of contract underlies both the Act and the LP Act.") (internal citations omitted).

[114] 288 A.3d 1083, 1110 (Del. 2022) (quoting *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 323 (Del. Ch. 1998)).

[115] *Id.* (quoting *Norton*, 67 A.3d at 368).

45

and the limitations on their rights.[116] Members of alternative entities "must appreciate that 'with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights.'"[117] In other words, particularly in the alternative entity context, equity will not save a bad contract.[118]

The approach Delaware courts take in a dispute over the internal affairs of an LLC flow from these well-established principles of alternative entity law, which are explicitly stated in the LLCA.[119] As the Court of Chancery put it in *In re Coinmint*, a case cited by both Holifield and the trial court, that approach is as follows:

> The first step when analyzing a case involving the internal affairs of an LLC is . . . to examine the LLC agreement to determine whether it addresses the issue. If the agreement covers the issue, the agreement controls unless it violates one of the [LLCA]'s mandatory provisions. If the agreement is silent, then the Court must look to the [LLCA] to see if one of its default provisions apply. If neither the agreement nor the [LLCA] addresses the matter, the rules of law and equity shall govern.[120]

---

[116] *See id.*; *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017).

[117] *Dieckman*, 155 A.3d at 366 (quoting *The Haynes Fam. Tr. v. Kinder Morgan G.P., Inc.*, 135 A.3d 76, 2016 WL 912184, at *2 (Del. Mar. 10, 2016) (TABLE)).

[118] *See, e.g.*, *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 508 (Del. 2019) ("[T]he implied covenant [of good faith] should not be used as 'an equitable remedy for rebalancing economic interests'—particularly where, as here, the parties are sophisticated business persons or entities.") (first quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); then quoting *West Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007)); *see also Nemec*, 991 A.2d at 1126 ("Parties have a right to enter into good and bad contracts, the law enforces both.").

[119] 6 *Del. C.* § 18–1101(b) provides "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements," while § 18–1104 provides "[i]n any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."

[120] *In re Coinmint, LLC*, 261 A.3d 867, 900–01 (Del. Ch. 2021) (internal citations omitted).

Accordingly, "[w]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts."[121]   Those principles are well-established:[122]

> When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language. Contracts will be interpreted to give each provision and term effect and not render any terms meaningless or illusory. When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. Language is ambiguous if it is susceptible to more than one reasonable interpretation. An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person would have accepted when entering the contract. The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous.[123]

Moreover, "[i]f a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[124]

### 3. *Freedom of Contract in LLC Agreements Extends to Contractually Specified Incurable Voidness*

Holifield acknowledges that Delaware is a contractarian state, particularly when it comes to construing LLC agreements. Yet, he argues that there are limits to private ordering and that Delaware courts retain an inherent measure of authority and equitable

---

[121] *Absalom*, 2019 WL 2655787, at *2 (quoting *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018)).

[122] *See, e.g.*, *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

[123] *Id.* (internal quotations omitted) (internal footnotes omitted).

[124] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

power with respect to limited liability companies. We agree.[125] However, Holifield has not persuaded us that, regardless of the words chosen, equity can always override the plain language of an LLC agreement with respect to incurable voidness. His argument that there are no words that can provide for incurable voidness does not follow from the LLCA. Nor is it compelled by the caselaw Holifield cites to support his claim.

The only case cited by Holifield on this point[126] involving an LLC, *In re Coinmint*, reinforces that Delaware LLC's are "creatures of contract."[127] The closest the Court of Chancery comes in that case to supporting Holifield's position is stating the non-controversial notion that: "As an enabling statute, '[t]he Act is replete with fundamental provisions made subject to modification in the [a]greement,' and therefore 'leaves latitude for substantial private ordering,' *provided that statutory and judicially imposed parameters are honored*."[128] But the court goes on to affirm its understanding that the drafters of LLC operating agreements are free to contractually agree that a noncompliant act can be void.[129]

---

[125] For example, it is well-established that parties to an LLC agreement cannot waive the implied covenant of good faith and fair dealing. 6 *Del. C.* § 18-1101(c).

[126] Opening Br. at 32 ("The throughline of *Pepsi-Cola*, *Paul*, *Coinmint*, and *Totta* is the recognition that Delaware courts retain an inherent measure of authority and oversight in Delaware contract relations—one that is supplemented by principles of law and equity—and one that endures even at the maximized outer bounds of contractual freedom.").

[127] *In re Coinmint, LLC*, 261 A.3d at 889. This means, in the trial court's words in *In re Coinmint*, that, per the LLCA, "contractual arrangements will be given effect to the fullest permissible extent" and "the limited liability company agreement serves as the primary source of rules governing the 'affairs of the limited liability company and the conduct of its business." *Id.* at 889–90 (internal quotations omitted).

[128] *Id.* at 889 (first citing *Jaffari*, 727 A.2d at 291; then citing *Salzberg v. Sciabacucchi*, 227 A.3d 102, 116 (Del. 2020)).

[129] *Id.* at 891 ("Drafters of operating agreements are also free to use their flexibility in contracting to agree that failure to follow certain procedures means an otherwise voidable action is void.

It does not suggest that this Court drew the line incorrectly with respect to such parameters in *CompoSecure II*.

The remaining cases cited by Holifield on this point do not concern LLCs, and thus, do not compel the result he advocates.[130]  In *Totta v. CCSB Fin. Corp.*,[131] for example, the Court of Chancery determined whether a corporation's bylaw, which purported to give the corporation's board conclusive and binding power to interpret a voting provision, which limited the voting power of certain stockholders, foreclosed judicial review and the Court of Chancery's application of equitable principles to the board's application of the voting limitation.[132]  It did not involve an LLC, an LLC agreement, or a contractual voidness provision.  With respect to the "conclusive and binding" bylaw provision, the Court of Chancery concluded that such a provision in a corporation's bylaw was invalid because it would mean "a corporate charter may alter the directors' fiduciary obligations and the attendant equitable standards a court will apply enforcing those obligations."[133]  In other

---

'[T]he contractual imposition of voidness trumps the common law.'") (first citing *CompoSecure II*, 206 A.3d at 817; then citing *Absalom*, 2019 WL 2655787, at *6)).

[130] *Paul v. Chromalytics Corp.* is addressed *infra* at [59].  *Paul*, 343 A.2d at 626.

In *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, this Court held that the parties to a bottling and distributorship agreement had waived a contractual integration clause by making and accepting oral modifications to the contract over the course of several decades.  297 A.2d 28, 33–34 (Del. 1972).  *Pepsi-Cola*, like *Paul*, did not involve an LLC, a transfer restriction in an operating agreement, or a contractual voidness provision.  Accordingly, *Pepsi-Cola* does not consider the strong freedom of contract principles that animate Delaware LLC law.

[131] 2022 WL 1751741 (Del. Ch. May 31, 2022), *aff'd*, 2023 WL 4628822, at *15 (Del. July 19, 2023).

[132] *Id.* at *14.

[133] *Id.*

49

words, it "would treat a corporate charter like the constitutive agreement that governs an alternative entity."[134] This, in the Court of Chancery's view, "contravene[d] fundamental principles of Delaware corporate law."[135]

The *Totta* trial court then discussed the differences between Delaware corporations and alternative entities:

> The sharp contrast between the extent to which fiduciary duties can be eliminated through private ordering in the alternative entity context versus in the corporate context is one of the defining features that distinguishes alternative entities from corporations. Delaware decisions have cited this contrast. Commentators have called attention to it repeatedly. Yet even alternative entities retain mandatory features and contain domains where equity continues to apply. The lesson is the same: The General Assembly can displace equity, but only when it does so expressly.[136]

The trial court and Holifield point to the final sentences of the foregoing excerpt as support for their contention. But the *Totta* trial court's noted mandatory features of alternative entities — *i.e.*, the requirement to file a certificate of incorporation with the Secretary of State — and core attributes only a sovereign can endow — *i.e.*, separate legal existence, potentially perpetual life, and limited liability for its members[137] — do not suggest that this Court's decision in *CompoSecure II* invaded the domain where equity continues to apply.[138] Moreover, they do not suggest that the LLCA's policy of giving maximum effect

---

[134] *Id.*

[135] *Id.*

[136] *Id.* at *17.

[137] *Id.* at *17 n. 193.

[138] In his memorandum opinion, the Vice Chancellor suggests there are constitutional considerations at play. Holifield does not raise this argument in his opening brief, and, accordingly, it is waived. Supr. Ct. R. 14(b)(vi)(A)(3).

to freedom of contract must necessarily yield at the doorstep of a clear and unambiguous provision providing for incurable voidness.

On appeal, this Court affirmed the Court of Chancery's decision in *Totta*.[139] We agreed with the trial court that the challenged corporate charter provision "cannot exculpate fiduciaries from breach of duty of loyalty claims because it is contrary to the laws of this State and its public policy."[140] And like the Court of Chancery, we highlighted the differences between Delaware corporations and Delaware alternative entities. We explained that, unlike Sections 18-1101(c), (e) of the LLCA, Section 102(b)(7) of the Delaware General Corporation Law "expressly prohibits" corporate directors from exculpating themselves from a breach of the duty of loyalty.[141] Further:

> Exculpation is also inconsistent with the public policy of this State to hold fiduciaries accountable for breaches of the duty of loyalty. As the Court of Chancery observed in *Sutherland*, the option to alter or eliminate fiduciary duties, if desired, *resides in the land of alternative entities*, not through a Delaware corporation formed under the DGCL.[142]

---

[139] *CCSB Fin. Corp. v. Totta*, 2023 WL 4628822, at *15 (Del. July 19, 2023).

[140] *Id.* at *8.

[141] *Id.* at *10.

[142] *Id.* (quoting *Sutherland v. Sutherland*, 2009 WL 857468 (Del. Ch. 2009)). In *Sutherland*, the Court of Chancery confronted a similar corporate bylaw provision. The court reached the same conclusion as we did in *Totta*. It held: "While such a provision is permissible under the Delaware Limited Liability Company Act and the Delaware Revised Uniform Limited Partnership Act, where freedom of contract is the guiding and overriding principle, it is expressly forbidden by the DGCL." *Sutherland*, 2009 WL 857468, at *4. *See also McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (observing that exculpatory "provisions cannot provide protection for directors who breach their duty of loyalty.").

In the "land of alternative entities," parties to constituent documents are given greater leeway in private ordering through contract. Nothing in Delaware law or public policy prohibits parties to an LLC agreement from contracting for incurable voidness.

### 4. *The Legislative Response to CompoSecure II and Absalom Counsels Adherence to the Rule in CompoSecure II*

As stated, the Delaware approach to disputes involving the internal affairs of an LLC is first to examine the LLC agreement, then to examine the default rules of the LLCA, and then the rules of law and equity. Because the LLC agreement in *CompoSecure II* addressed the Sales Agreement, this Court applied the plain language of the LLC agreement and did not need to look for an applicable default rule in the LLCA or to apply the rules of equity. The General Assembly responded by amending the LLCA: After this Court's decision in *CompoSecure II*, and the Court of Chancery's decision in *Absalom*, the General Assembly adopted Section 18-106(e) of the LLCA in 2021. In doing so, it expressly noted:

> New subsection (e) is intended to provide a rule different from the rule applied in Composecure, L.L.C. v. Cardux, LLC, 206 A.3d 807 (Del. 2018), and Absalom Absalom Trust v. Saint Gervais LLC, 2019 WL 2655787 (Del. Ch. June 27, 2019), that acts or transactions determined to be void generally may not be ratified.[143]

Under the new provision, an LLC may ratify an act that is void because approvals required by the LLC's operating agreement were not obtained, or waive the approval requirements, via its "members, managers or other persons whose approval would be

---

[143] Del. S.B. 114 syn., 151st Gen Assem., 83 Del. Laws ch. 61, § 1 (2021), https://legis.delaware.gov/BillDetail?LegislationId=58603.

required under the limited liability company agreement."[144] In other words, the amendment would have allowed the LLC members to ratify the Sales Agreement in *CompoSecure II*. However, the provision is limited to ratification of the LLC's own breaching acts. It does not apply to acts of LLC members, such as the acts at issue in *Absalom* and in this case.

Thus, the General Assembly has addressed the specific issue of contractual voidness, and it did not go as far as the Vice Chancellor suggests this Court should.[145] We decline to extend the General Assembly's amendment judicially, after the General Assembly did not do so legislatively.

---

[144] 6 *Del. C.* § 18-106(e). The new section provides, in relevant part:

> (e) Any act or transaction that may be taken by or in respect of a limited liability company under this chapter or a limited liability company agreement, but that is void or voidable when taken, may be ratified (or the failure to comply with any requirements of the limited liability company agreement making such act or transaction void or voidable may be waived) by the members, managers or other persons whose approval would be required under the limited liability company agreement:
>
> > (1) For such act or transaction to be validly taken; or
> >
> > (2) To amend the limited liability company agreement in a manner that would permit such act or transaction to be validly taken, in each case at the time of such ratification or waiver;
>
> provided, that if the void or voidable act or transaction was the issuance or assignment of any limited liability company interests, the limited liability company interests purportedly issued or assigned shall be deemed not to have been issued or assigned for purposes of determining whether the void or voidable act or transaction was ratified or waived pursuant to this subsection. Any act or transaction ratified, or with respect to which the failure to comply with any requirements of the limited liability company agreement is waived, pursuant to this subsection shall be deemed validly taken at the time of such act or transaction . . . .

[145] *Chancery Opinion*, 283 A.3d at 657 n. 83 ("The statutory amendment is a half-loaf in that it gives those in control of the LLC a route to fixing defective acts that otherwise would be incurably void, but it does not provide a means of relief for other parties.").

### 5. Finally, the Brookfield Guideposts Counsel Against Overruling CompoSecure

When asked to reexamine this Court's precedent, we consider our doctrine of *stare decisis*. As this Court recently observed in *Brookfield Asset Mgmt., Inc. v. Rosson*, "the development of and adherence to precedent is an essential feature of common law systems, and as such, precedent should not be lightly cast aside."[146] Further, "[w]hen re-examining a question of law in a prior case, the essential danger is that parties have acted in reliance on the answer that this Court previously gave."[147] "Mere disagreement with the reasoning and outcome of a prior case, even *strong* disagreement, cannot be adequate justification for departing from precedent or *stare decisis* would have no meaning."[148] "Under the doctrine of *stare decisis*, settled law is overruled only 'for urgent reasons and upon clear manifestation of error.'"[149] Holifield has not demonstrated that any of the "guideposts" considered by Delaware and the federal courts "to measure and weigh these reliance interests" counsel in favor of overruling or modifying *CompoSecure II*.

#### a. The Nature of the Reliance Interests

One consideration in determining whether a prior decision is immutable is the "nature of any reliance interests in the decision," including "the 'antiquity' of the precedent," which we will "accord[] importance." [150] Settled law is overruled only for

---

[146] 261 A.3d 1251, 1278 (Del. 2021).

[147] *Id.* (citing *State v. Barnes*, 116 A.3d 883, 891 (Del. 2015)).

[148] *Id.*

[149] *Id.* at 1278 (citing *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 124 (Del. 2006)).

[150] *Id.* at 1278–79 (citing *Gamble v. United States*, 139 S. Ct. 1960, 1969 (2019).

urgent reasons and upon clear manifestation of error.[151]  As noted above, even the Vice

Chancellor, in offering a "preferred" approach, maintains that *CompoSecure II* was not

wrongly decided.  Because we agree, and because settled law is overruled only for urgent

reasons and upon clear manifestation of error," there is no "clear manifestation of error"

here.

As for the "antiquity" of the precedent, *CompoSecure II* is only five years old.  And

notwithstanding the Vice Chancellor's scholarly "whirlwind historical tour" of the law-

equity divide from the time of medieval England, that discussion, including the Vice

Chancellor's rethinking of his own views expressed in *Klassen*, suggests, if anything, that

the subject of "voidness" has been a vacillating area of law for centuries marked by shifting

changes in both case law and legislatively.[152]

The three authorities cited by Holifield and the Vice Chancellor do not, in our view,

undermine our holding in *CompoSecure II*.  Moreover, only one of them — *Eureka VIII

LLC v. Niagara Falls Hldgs. LLC*,[153]  — concerns a Delaware LLC.

In *Eureka VIII LLC*, the Court of Chancery, writing before this Court's decision in

*CompoSecure II*, was asked to determine whether an LLC member violated a transfer

restriction contained in the operative LLC agreement when it indirectly transferred its LLC

---

[151] *Id.* (citing *Seinfeld*, 909 A.2d at 124).

[152] This observation is not a criticism.  We acknowledge that we have undertaken such re-examinations and have reversed ourselves on a number of occasions.  *See, e.g., Horizon Services v. Henry*, ___ A.3d ___, ___, 2023 WL 5659812 (Del. 2023); *Brookfield*, 261 A.3d at 1280; *Sherman v. State Dep't of Pub. Safety*, 190 A.3d 148 (Del. 2018).

[153] 889 A.2d 95 (Del. Ch. June 6, 2006).

interests to a creditor without the written consent of the LLC.[154] The transfer restriction provided that any noncompliant transfer "shall be void *ab initio*."[155] In a motion for summary judgment, the defendant argued that the LLC had orally communicated that consent was not required, and had therefore modified or waived the transfer restriction.[156] The Vice Chancellor expressly did not decide "whether a contractual provision requiring written modifications or waivers can itself be modified by the oral statements or conduct of a party," and the Vice Chancellor did not come to a conclusion on that issue because other grounds, not relevant to this case, existed to find that the defendant had breached the operative agreement.[157] The Court of Chancery rejected a laches defense raised by the defendant, but the court found that it did not raise a triable issue of fact that precluded summary judgment. To the extent the defendant raised other equitable defenses, the court declined to address them due to their "lack of force."[158] Thus, the Court of Chancery did not, in the end, directly confront the issue or elevate equitable defenses over the contractual voidness provision.

---

[154] *Id.* at 97.

[155] *Id.* at 100.

[156] *Id.* at 108.

[157] *Id.* at 109. *See id*. at 109–110 (observing that "[t]he law has long struggled with the question of whether a contractual provision requiring written modifications or waivers can itself be modified by the oral statements or conduct of a party," and that "[the court] do[es] not venture further into this thicket because it is not necessary," since "[t]wo other grounds exist to demonstrate that Holdings violated the LLC Agreement" as a result of the challenged transfer).

[158] *Id*. at 113, n.38.

Holifield, like the Court of Chancery, next relies on *Genger v. TR Invs., LLC*.[159]

Although *Genger* analyzed the equitable defense of ratification in a claim that a stockholder

transferred shares in a Delaware entity in contravention of a transfer restriction, *Genger* is

inapposite. On appeal, this Court affirmed the Court of Chancery's judgment that an LLC

(referred to therein as the Trump Group) did not ratify the appellant's transfer of his stock

in a Delaware corporation, which had violated a transfer restriction in the operative

stockholders' agreement.[160] This Court held that "[a]t no point did the Trump Group ratify

the 2004 Transfers, either expressly or by implication. To the contrary, at all times the

Trump Group acted consistently with their position that the 2004 Transfers were void."[161]

The question of whether equitable defenses trump a contractual voidness provision was not

directly before this Court, and accordingly, this Court did not address it. Moreover, the

transfer was a transfer of shares of a Delaware corporation, not membership interests in an

LLC, and the transfer restriction was in a stockholders' agreement, not the constituent

document of an LLC.[162]

---

[159] 26 A.3d 180 (Del. 2011).

[160] *Id.* at 195–96.

[161] *Id.* at 196.

[162] The trial court appears to read the Court of Chancery's decision in *Genger* as having found at least a partial ratification of the non-compliant transfer. *See Chancery Opinion*, 283 A.3d at 649. However, we read the Court of Chancery's decision in *Genger* as having rejected the defenses of laches, acquiescence and ratification entirely due to defendant's failure to satisfy the burden of proof. *See, e.g., TR Invs., LLC v. Genger*, 2010 WL 2901704, at *17 (finding that "the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers"); *id.* at *18 (noting that at all times the Trump Group took the position that the 2004 transfers were void and that "the Trump Group did not ratify the 2004 Transfers"). Thus, there was no need to address the question of whether those equitable defenses could prevail in the fact of the contractual voidness provision. The Vice Chancellor, here, raises the logical point that the court would not

Finally, as does the Court of Chancery, Holifield points to *Paul v. Chromalytics Corp.*[163]  As noted above, *Paul* involved an anti-assignment provision in an agreement to purchase assets in a corporation, not in an operating agreement governing a Delaware LLC.[164]  Moreover, the interests being transferred were an assignment of rights and title to a promissory note.[165]  But most importantly, the *Paul* court enforced the anti-assignment provision against the plaintiff, who was the assignee of the promissory note.[166]  Rejecting the plaintiff's contention that the defendant had waived the anti-assignment provision, the court held that because plaintiff received the rights and title to the promissory note in a contractually void transaction, he lacked standing to sue the counterparty to the note.[167] The court further noted that although the plaintiff did not have standing to sue the counterparty to the note, he did have standing to sue the assignor of the note.[168]  That would be comparable to permitting Blue to pursue a claim against Holifield.  It has no bearing on Holifield's dispute with XRI.

---

have considered those defenses if they were not at least a legal possibility.  Nevertheless, the specific issue of whether the defenses were even available does not appear to have been raised, and neither the Court of Chancery, nor this Court addressed it in *Genger*.  Further, we affirmed the Court of Chancery's rejection of the ratification defense on both factual and legal grounds.  *See Genger*, 26 A.3d at 196 (holding that "[a]t no point did the Trump Group ratify the 2004 Transfers, either expressly or by implication[,]" that "[t]o the contrary, at all times the Trump Group acted consistently with their positions that the 2004 Transfers were void[,]" and that "Genger's ratification claim, therefore, fails on factual and legal grounds.").

[163] 343 A.2d 622 (Del. Super. Ct. 1975).

[164] *Id.* at 624.

[165] *Id.*

[166] *Id.* at 626.

[167] *Id.*

[168] *Id.*

In sum, these three pre-*CompoSecure II* cases do not persuade us that we should overrule *CompoSecure II*.

### b. Area of the Law the Precedent Addresses

"The area of law the precedent addresses is likewise a consideration, since some subjects are more apt to induce reliance than others."[169] In "cases involving property and contract rights[,]" "considerations favoring *stare decisis* are 'at their acme.'"[170] As mentioned above, contractual "voidness" has been a thorny area of the law for a very long time. Both parties and courts have been imprecise in their use of the word "void."[171] "A range of authorities suggests that parties, courts, and legislators do not regard the term 'void' as having a settled meaning of 'void *ab initio*.'"[172] For example, in 2014, this Court overruled several cases that had used the word "void," noting that "[r]egrettably, in writing those opinions, the authors may have been less than precise in their use of the terms 'void' and 'voidable'"[173] despite "the well-established distinction between void and voidable corporate actions."[174]

In addition, the consequences of a void act are severe. At least prior to the General Assembly's enactment of Sections 204 and 205 of the DGCL, a void act could essentially be unfixable in the corporate context. "Void acts create serious difficulties because of a

---

[169] *Brookfield*, 261 A.3d at 1279.

[170] *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 457 (2015).

[171] *Chancery Opinion*, 283 A.3d at 663 n. 98 (collecting cases).

[172] *Id.* at 663.

[173] *Klaassen II*, 106 A.3d at 1047.

[174] *Id.* at 1046.

'domino effect' in which one defective corporate act can infect subsequent acts."[175] In 2014, the General Assembly enacted Sections 204 and 205 of the DGCL. Those sections were designed to provide mechanisms for a corporation to unilaterally ratify defective corporate acts or seek relief from the Court of Chancery to validate any corporate act under certain circumstances.[176] The new sections gave corporations multiple avenues to remedy certain transactions including stock and option issuances, for example, that under prior case law, might otherwise have been void and incapable of ratification as a result of noncompliance with governing law or the corporation's own organizational documents.[177] They also provided a means of ratifying other corporate acts that may not have been properly authorized in the first instance. Section 205 (upon application by specified

---

[175] *Chancery Opinion*, 283 A.3d at 654 (citing C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 402 (2014) and *Olson v. EV3, Inc.*, 2011 WL 704409, at *11 (Del. Ch. Feb. 21, 2011)).

[176] *See* Del. H.B. 127 syn., 147th Gen Assem., 79 Del. Laws ch. 72, § 5 (2014), https://legis.delaware.gov/BillDetail?LegislationId=22641 (hereinafter, "Synopsis").

[177] As noted in the Synopsis to House Bill 127, Section 204 was:

"intended to overturn the holdings in case law, such as *STARR Surgical Co. v. Waggoner*, 588 A.2d 1130 (Del. 1991) and *Blades v. Wisehart*, 2010 WL 4638603 (Del. Ch. Nov. 17, 2010), that corporate acts or transactions and stock found to be 'void' due to a failure to comply with the applicable provisions of the General Corporation Law or the corporation's organizational documents may not be ratified or otherwise validated on equitable grounds. The term 'defective corporate act' is intended to include all corporate acts and transactions, including elections or appointments of directors, purportedly taken that were within the power granted to a corporation under this title but are subsequently determined not to have been effected in accordance with the applicable provisions of the General Corporation Law, the corporation's certificate of incorporation or bylaws , or any plan or other agreement to which the corporation is a party, where the failure to comply with such provisions, documents or instruments would render such act void or voidable.

Synopsis at ¶ 1.

60

interested parties), gave corporations the ability to seek a determination of the validity of acts that were not susceptible to being cured under Section 204. Accordingly, we acknowledge that recent legislative efforts, by providing equitable solutions to otherwise incurable defects, have moved in the direction of trying to ameliorate the harsh consequences of defective corporate acts.

With regard to "void" provisions in private contracts, as opposed to acts that are void because they exceed powers granted by the state or because they contravene a corporate charter, for example, we do not pretend that there is no tension between the role of equity in Delaware law and the principle of freedom of contract in the alternative entity sphere. But as we most recently reiterated in *Totta*, there is much greater room for contractual flexibility in the alternative entity arena. Moreover, *CompoSecure II* addressed a contract provision that embodied the "voidness" concept in irrefutably unmistakable terms — "*void and of no force and effect whatsoever*." Failure to give effect to that unmistakably clear language used in the alternative entity context allows courts to simply rewrite the contract. Such a result would negatively impinge on the goal of achieving predictability in contracts and undermine the important principle of freedom of contract legislatively embodied in the alternative entity statutes.

### c. *Clarity and Administrability*

The third guidepost concerns the clarity and administrability of the challenged precedent. As we said in *Brookfield*:

> [c]larity and administrability also relate to reliance interests, since reliance can only be created by a ruling which is amenable to consistent, stable, and thus predictable application. Thus, a "traditional justification for overruling

a prior case is that a precedent may be a positive detriment to coherence and consistency in the law, either because of inherent confusion created by an unworkable decision, or because the decision poses a direct obstacle to the realization of important objectives embodied in other laws."[178]

*CompoSecure II* articulates a straightforward rule of contractually specified incurable voidness in the alternative entity context, a rule that Delaware's trial courts have followed since *CompoSecure II* was decided.[179] Additionally, as discussed, the General Assembly in 2021 amended Section 18-106, providing a narrow way around contractual voidness provisions for one party, the LLC, through one remedy, ratification. With this amendment, the General Assembly implicitly approved of the remainder of the holding.[180]

### d. Institutional Considerations

Finally, we stated in *Brookfield* that "[b]ounded up with reliance interests are institutional considerations of the Court."[181] In this regard, we observed that "[p]recedent should not be overturned by narrow majorities and very recent precedent should not lightly

---

[178] *Brookfield*, 261 A.3d at 1279 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989), *superseded by statute as stated in CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008)).

[179] *See Absalom*, 2019 WL 2655787, at * 4 ("under *CompoSecure* [*II*], Absalom cannot rely on equitable defenses to validate its status as a member," because using the word "void" in the LLC Agreement renders a noncompliant assignment "invulnerable to equitable defenses."); *see also In re Coinmint, LLC*, 261 A.3d at 891 ("[d]rafters of operating agreements are also free to use their flexibility in contracting to agree that failure to follow certain procedures means an otherwise voidable action is void.").

[180] *Cf. Brookfield*, 261 A.3d at 1278 n. 144 (noting that prior decisions of this Court interpreting statutes "gain approving harmony from ensuing legislative silence") (citing *Nationwide Prop. & Cas. Ins. Co. v. Irizarry*, 2020 WL 525667, at *4 (Del. Super. Ct. Jan. 31, 2020), *aff'd*, 238 A.3d 191 (Del. Aug. 2020)); *State v. Barnes*, 116 A.3d 883, 892 (Del. 2015) ("[W]hen the prior judicial interpretation was subject to being overturned by the operation of the legislative process and was not overturned, the justification for departing from *stare decisis* is even more tenuous.") (quoting *Harvey v. City of Newark*, 2010 WL 4240625, at *7 (Del. Ch. Oct. 20, 2010)).

[181] *Brookfield*, 261 A.3d at 1279.

be overturned when the only change is the composition of the court, because society must be able to 'presume that bedrock principles are founded in the law rather than in the proclivities of individuals.'"[182]  Apart from the General Assembly's amendment to Section 18-106, the only thing that has changed in the mere five years since we decided *CompoSecure II* is the composition of this Court.  Accordingly, we are not inclined to overrule *CompoSecure II*, or modify it, beyond the General Assembly's statutory amendment.

## B. The Plain Language of the LLC Agreement Provides that Noncompliant Transfers are Incurably Void

Because we uphold this Court's core holding in *CompoSecure II* — that parties to an LLC agreement may provide that an act that does not comply with the LLC agreement is incurably void — we address whether the specific language in the Contractual Voidness Provision provides for that outcome with respect to noncompliant transfers of XRI membership interests.

### 1. The Plain Language of the LLC Agreement Must be Unambiguous, but Magic Words are Not Required

Below, the Court of Chancery stated the following about *CompoSecure II*:  "Under the reasoning of [*CompoSecure II*], if parties to a contract specify that a noncompliant act is 'void,' then the act is void *ab initio* with all of the consequences attendant to that status

---

[182] *Id.* at 1279–80 (internal footnotes omitted) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986)).

under the common law."[183]  Holifield argues that the language in the LLC Agreement —

"shall be void" — is insufficient to demonstrate incurable voidness.

As noted above, Holifield did not raise this point below and the trial court did not

discuss whether the Contractual Voidness Provision is ambiguous.  At oral argument before

this Court, both sides agreed that neither side contended that the provision was

ambiguous.[184]  Accordingly, the argument is waived.[185]  However, we do address our

concern that the Court of Chancery's opinion suggests, in several places, that *CompoSecure*

*II* holds that the mere use of the word "void" renders a noncompliant act incurably void.[186]

---

[183] *Chancery Opinion*, 283 A.3d at 641–42.  The Court of Chancery read *CompoSecure II* the same way in *Absalom*.  *Absalom*, 2019 WL 2655787, at *3 ("In *CompoSecure*, the Delaware Supreme Court recently held that by using the word 'void' in an LLC agreement, the parties to the agreement adopted the common law rule and foreclosed the application of equitable defenses.").

[184] *See, e.g.*, Oral Argument at 5:56– 6:27, *Holifield, et al. v. XRI Investment Hldgs. LLC*, 407, 2022, *available at* https://livestream.com/accounts/5969852/events/10842489/videos/236684626 [hereinafter Oral Argument at __].  The following exchange occurred:

> THE COURT:  Just so we're clear, no party argued in the proceedings below that Section 8.03 was ambiguous.  That's the provision that contains the void language…
>
> HOLIFIELD'S COUNSEL:  That's correct, Your Honor.  And I would submit, just to be clear, I think my friends . . . say that it is unambiguous.  So they did maintain that, at least at some point in their briefing.

[185] Supr. Ct. R. 8.

[186] *See, e.g.*, *Chancery Opinion*, 283 A.3d at 592 ("That decision reasons that when parties to an LLC agreement use the word 'void' to describe the consequence of a noncompliant act, they have specified that the act is void *ab initio*, with all of the implications that the term carries at common law."); *id*. ("[u]nder *CompoSecure II*, equity cannot serve that purpose [of ameliorating harsh results] if the parties have chosen to use the word 'void' to describe the consequence of contractual noncompliance."); *id*. at 644 ("[t]he *CompoSecure II* decision thus held that when an agreement states that a noncompliant act is 'void,' then the plain language of that provision trumps the common law and requires that a court deem the act void *ab initio*.").

64

First, *CompoSecure II* did not hold, or even suggest, that in every case that parties use the word "void," a noncompliant act will be incurably void. Instead, we stated that the plain language of an LLC agreement — there "*void and of no force or effect whatsoever*" — provided for that result in that case. Although the use of the word "void" in a provision could provide for incurable voidness unambiguously — as is the case here — it could also be ambiguous.[187] Thus, our decision in *CompoSecure II* does not mean any use of the word "void" in a contract renders the noncompliant act incurably void. Courts will apply our well-established principles of contract interpretation to determine the meaning in the given context of the instrument. Here, the use of the word "void," the language prohibiting XRI from recording a noncompliant transfer on its books, and the language prohibiting XRI from recognizing a transferee of a noncompliant transfer as the owner of units, in addition to the contractual context, clearly demonstrated an intent by the parties to render a noncompliant transfer incurably void.

Second, Holifield argues that this Court should require more emphatic and specific language, such as the language used in *CompoSecure II* ("void and of no force or effect whatsoever"), *Absalom* ("null and void"),[188] and *Southpaw* ("null and void *ab initio*").[189] Specifically, he suggests this Court adopt the phrase "null and void *ab initio*" as a

---

[187] Given the "less than precise . . . use of the terms 'void' and 'voidable'" by authors of opinions, *see Klaassen* II, 106 A.3d at 1047, and litigants alike, *see Chancery Opinion*, 283 A.3d at 663 n. 98 (collecting cases), a contract that solely employs the word "void" may be ambiguous.

[188] *Absalom*, 2019 WL 2655787, at *5. ("In light of the Supreme Court's holding in *CompoSecure*, the plain language of 'null and void' reflects a specific intent to override the common law and cause the transfer to be void.").

[189] *Southpaw* was decided before *CompoSecure II*.

contractual language formulation that clearly and emphatically specifies incurable voidness.

Although we reject Holifield's request to require talismanic magic words to contract for incurable voidness in LLC agreements, words can matter.[190] Holifield is correct, as noted above, that in *CompoSecure II* this Court was presented with emphatic language of incurable voidness — "*void and of no force and effect whatsoever.*"[191] Black's Law Dictionary defines "void" as being "of no legal effect; to null."[192] "Whatsoever" means "used after a negative phrase to add emphasis to the idea that is being expressed."[193]

---

[190] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039 (Del. 2023) (construing the word "and" in a stock option agreement).

[191] In litigating this case, the parties referred to the language in *Absalom* — "null and void" — and the language in *Southpaw* — "void *ab initio*" — as "void-plus" language. If "void" is regular, and "void *ab initio*" is void-plus, as the parties here suggest, then the agreement at issue in *CompoSecure II* was powered by the higher octane "void premium" language. In recognizing these language variations, we acknowledge that parties in other cases have used the term "void" imprecisely and there could be ambiguity in a given situation where parties argue they have contracted for incurable voidness.

[192] Void, Black's Law Dictionary (11th ed. 2019). Further, "[t]he distinction between *void* and *voidable* is often of great practical importance. Whenever technical accuracy is required, *void* can be properly applied only to those provisions that are of no effect whatsoever — those that are an absolute nullity." *Id.*

[193] Whatsoever, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/whatsoever; *see also* Whatsoever, Britannica.com, Britannica Dictionary, ("of any kind or amount at all"), https://www.britannica.com/dictionary/whatsoever. Holifield agreed at oral argument that the language in *CompoSecure II* was clear and referred to the language as "void plus" language. The following exchange occurred:

> THE COURT: So, I'm trying to understand what you're arguing. Are you arguing that even though the contract might say "void *ab initio*" or whatever the magic language is to express that its void *ab initio* that equity always has jurisdiction to review that provision regardless of what the parties contracted for?
>
> HOLIFIELD'S COUNSEL: First, I would submit that if the matter is brought in the Court of Chancery, that that inherent remedial discretion exists, it's a baseline domain. But to the point of the language formulation, *CompoSecure,* and we

66

However, parties need not employ this exact language, or Holifield's suggested phrase, to evince their intent to render a noncompliant act incurably void. The Contractual Voidness Provision in this case is clear and unambiguous, and no party has argued to the contrary.

2. *The Language of the Contractual Voidness Provision Here is Unambiguous*

The plain language of the LLC Agreement provides that noncompliant transfers, like the Blue Transfer, are incurably void. Section 8 of the LLC Agreement governs transfers of XRI interests and admission of members. The No Transfer Provision — Section 8.01(a) — broadly prohibits transfers, except those consented to by the XRI Board or otherwise falling under an exception delineated therein, including a transfer to a Permitted Transferee. Class A Members (*i.e.*, Morgan Stanley) are permitted greater leeway in transferring their interests than are Class B Members (*i.e.*, Holifield).[194] The Contractual Voidness Provision — Section 8.03 — states, in its entirety:

> **Transfers In Violation of Agreement.** Any Transfer or attempted Transfer in violation of this <u>Article VIII</u> shall be void, and none of the Company or any of its respective Subsidiaries shall record such purported Transfer on its books or treat any purported Transferee as the owner of such Units.[195]

---

submit thoughtfully, considered the term "void and of no further force and effect whatsoever." We would call that "void plus" language. And that that's the kind of language that would be necessary to signify intent to, to specify intent, to make it void *ab initio*.

Oral Argument at 18:13–19:22. We note that at oral argument before this Court, counsel for CardUX agreed that the voidness language at issue there meant incurably void.

[194] App. to Opening Br. at A0104 (LLC Agreement § 8.01(a)) ("Unless expressly contemplated by another provision of this Agreement, no Member may Transfer any of its Units or other Company Interests except, . . . (v) in the case of a Class A member, to any Person or group of Persons so long as such Class A Member complies with <u>Sections 8.04</u> [Member Co-Sale Obligation] and <u>8.05</u> [Right of First Refusal ], if applicable.").

[195] *Id.* at A106 (LLC Agreement § 8.03).

The Contractual Voidness Provision not only states that noncompliant transfers "shall be void," but prohibits XRI from acknowledging such a transfer with the "shall not" language following the voidness language. That language prohibits XRI from recording a noncompliant transfer and treating the Transferee as the owner of such Units and supports a plain language reading that a noncompliant transfer is incurably void.

### 3. The Context of the Contractual Voidness Provision

Further, the plain language of the Contractual Voidness Provision is buttressed by the context in which it sits: a transfer restriction in a private, closely held LLC, with sophisticated members. Delaware courts recognize the important policy of picking your partner, particularly in a closely held LLC.[196] In discussing judicial interpretations of

---

[196] *See, e.g.*, *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 804 n.14 (Del. Ch. 2011). Discussing Sections §§ 18-702, 18-704(a), and 18-301 concerning the assignment of a limited liability company interest and the assignee's possible, subsequent admission as a member of the LLC, the Court of Chancery observed:

> The second reason [the first being tax-related] for the default rules in the Act regarding the transferability of interests may rest on the notion that one generally is entitled to select his own business associates in a closely held enterprise, like an LLC. *E.g.,* 68 C.J.S. *Partnership* § 1 (2011) ("A 'partnership' has been defined as a contractual relationship or a *voluntary association of two or more competent persons* to place their money, effects, labor, and skill or some or all of them in lawful commerce or business . . . .") (emphasis added); 46 AM.JUR.2D § 1 (2011) ("[A] joint venture is an association of persons *with the intent . . .* to engage in and carry out a single business venture for joint profit.").

*Id.* (emphasis in original). *See also* 3 JAMES D. COX & THOMAS LEE HAZEN, TREATISE ON THE LAW OF CORPORATIONS § 14:9 (3d. 2022) ("In closely held corporations, on the other hand, the participants usually do not want shares to be freely transferable. For similar reasons, LLC members and partners in many partnership ventures may opt to enter in to restrictions of transferability."); Stephen L. Sepinuck, *Protecting the "Pick-Your-Partner" Principle*, 4 Transactional Law. 1 (2014) ("In creating or restructuring a business as a closely held LLC, the members often wish to restrict themselves and each other from transferring a membership interest without the consent of the other owners.").

Sections §§ 18-702(b)(3) and 18-304 of the LLCA, the Court of Chancery in *Milford Power*

*Co., LLC v. PDC Milford Power, LLC*, noted the observation that:

> Delaware's default law specifically distinguished between those aspects of
> an LLC Agreement that should not be freely transferable because substitute
> performance should not be imposed on the other members absent their
> express consent (i.e., the managerial powers and duties) and those aspects
> that should be freely transferable (i.e., the passive right to share in profits and
> losses). This distinction, like those made by federal law, recognizes that it is
> far more tolerable to have to suffer a new passive co-investor one did not
> choose than to endure a new co-manager without consent.[197]

This is particularly true where one party — here, Morgan Stanley — is contributing

financing, while the other party — Holifield — is contributing skills necessary for the

operation of the business. As a closely-held entity, XRI had a strong interest in controlling

its ownership. It makes sense that the members to such an LLC would contract for voidness

of a noncompliant transfer of LLC interests, particularly where Holifield's LLC interests

secured the XRI Loan, *i.e.*, the consideration paid by Morgan Stanley for its investment in

the venture.

The plain language and the context of the Contractual Voidness Provision indicate

that the parties unambiguously provided for a noncompliant transfer to be incurably void.

Accordingly, we AFFIRM the judgment of the Court of Chancery that the plain language

of the LLC Agreement provides that the Blue Transfer is incurably void.

## C. *Cross-Appeal*

XRI appeals the trial court's order rejecting its claims for breach of contract

damages and recoupment of legal expenses advanced to Holifield under the LLC

---

[197] 866 A.2d 738, 760 (Del. Ch. 2004).

Agreement. For the reasons set forth below, we find that XRI is entitled to recover breach of contract damages and that additional proceedings are needed to determine whether XRI is entitled to recoup legal expenses advanced to Holifield under the LLC Agreement.

### 1. *XRI Preserved Its Claims for Damages and Recoupment*

The trial court rejected the parties' jointly submitted proposed stipulation and partial final judgment under Rule 54(b) that would have expressly preserved XRI's breach of contract damages claim and its recoupment claim because it found that XRI raised both arguments only as "oh by the way" arguments in its post-trial brief,[198] and, as to the damages claim, "XRI never specified a damages figure."[199] After an examination of the record below, we disagree that XRI did not preserve the issue. XRI noted the issue in its operative complaint[200] and in post-trial briefing and argument.[201] Moreover, for his part, Holifield stipulated, in the parties' proposed partial order and judgment, that both issues were preserved pending the outcome of any appeal.[202] Further, on appeal, Holifield

---

[198] App. to Answering Br. at B0346 (Final Order and Judgment ¶ 8(a), (b)).

[199] *Id.* (Final Order and Judgment ¶ 8(b)).

[200] *Id.* at B0005 (First Amended Verified Complaint ¶ 13) ("XRI also seeks damages against Holifield resulting from his breach of the express terms of the XRI Company Agreement."), B0026 (First Amended Verified Complaint ¶ 113) ("As a proximate result of Holifield's breach, XRI has incurred damages in an amount to be determined at trial."), B0029 (First Amended Verified Complaint, Prayer for Relief (iii)) (requesting an order awarding damages, prejudgment interest, and costs, including attorneys' fees incurred in bringing this action).

[201] *Id.* at B0205–06 (Plaintiff's Post-Trial Brief at ¶ V.B.) (seeking relief in the form of damages "equal to the costs of defending and resolving the Texas Action" and "the sums advanced to Holifield"); B0276 (Post-Trial Oral Argument Transcript at 69) (seeking damages for Texas Action and recoupment of expenses advanced to Holifield).

[202] *Id.* at B0341 ([Proposed] Partial Final Judgment Pursuant to Rule 54(B) at ¶¶ 6, 8)).

concedes that XRI did in fact raise each issue below.[203]  We now turn to the Court of Chancery's conclusion that its finding of acquiescence precludes each type of relief sought by XRI on cross-appeal.

2. *The Court of Chancery's Dictum Finding of Acquiescence Does Not Preclude Recovery of Breach of Contract Damages or Recoupment of Legal Expenses*

In addition to finding that XRI failed to preserve both its damages and recoupment claims, the Court of Chancery held that XRI's "knowing participation in the [Blue Transfer] would preclude any relief" as to both claims.[204]  Although Holifield is correct in stating that this Court reviews an award of damages for an abuse of discretion, "our review of embedded legal issues is *de novo*."[205]  The trial court's application of *CompoSecure II* to a claim for breach of contract damages is an embedded legal issue, as is the question of whether the trial court's finding of acquiescence precludes a finding that Holifield acted within the contractual standard required for recoupment.

---

[203] Appellant's Reply Br. at 39 ("XRI raised the issue, but did not specify any damages in connection with trial . . ..");  *id.* at 42 ("XRI raised the issue but failed to preserve it in connection with trial . . ..").  The fact that XRI did not specify a damages figure in connection with trial, while it continued to incur damages, does not preclude recovery.  XRI could not have specified an amount of damages, let alone attempted to prove such damages at trial, because the Texas Action did not settle until days after trial concluded.  Trial concluded on June 15, 2022.  XRI and Assurance settled the Texas Action on June 21, 2022.  XRI submitted its post-trial brief on July 1, 2022.

[204] App. to Answering Br. at B0346 (Final Order and Judgment ¶ 8(a), (b)).

[205] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1139–40 (Del. 2015) (Valihura, J., concurring in part and dissenting in part) (citing *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) ("Whether or not an equitable remedy exists or is applied using the correct standards is an issue of law and reviewed *de novo*.")).

### a. Breach of Contract Damages

Following *CompoSecure II*, the Court of Chancery found that Holifield breached the LLC Agreement[206] and awarded declaratory relief, despite its finding of acquiescence. The rationale for awarding declaratory relief — that Holifield breached the LLC Agreement — applies equally to an award of damages.[207] XRI argues that Holifield's breach of the No Transfer Provision resulted in damages arising out of the Texas Action. XRI explains that after Holifield defaulted on the Assurance Loan, Assurance sued XRI in Texas, asserting an interest in the Disputed Units. Specifically, Assurance alleged, in part, that XRI's attempt to strictly foreclose on the Disputed Units ran afoul of the UCC because "XRI did not provide notice to either GH Blue and Assurance, both of which are required to be notified under the [UCC]" because "both had a claim to an interest in the XRI shares and/or the proceeds thereof."[208]

Assurance also sought to force a commercial sale of the Disputed Units.[209] XRI contends that if the district court in Texas had ordered a sale, bidders likely would have

---

[206] *Chancery Opinion*, 283 A.3d at 668 ("Under the Contractual Voidness Provision and the reasoning of *CompoSecure II*, the Blue Transfer is void *ab initio*. The Blue Transfer is therefore incurably void, and Holifield cannot defeat the claim of breach or the relief XRI seeks by invoking the doctrine of acquiescence.").

[207] *See* LLC Agreement § 11.04.

[208] App. to Answering Br. at B0639 (Texas Action Original Petition ¶ 43(c)); *see also id.* at B721 (Assurance's Responses and Objections to XRI's Requests for Admissions (Texas Action), dated Nov. 1, 2021) (responding to a request for admission "that Assurance does not have a right to sell, liquidate, foreclose, or transfer the XRI Class B Units in 2018 or 2019," by stating "Assurance admits that it has certain rights and claims to the XRI Class B Units by virtue of various documents it has signed with Entia, Holifield, and GH Blue").

[209] *Id.* at B0640 (Texas Action Original Petition ¶ 45) ("Assurance is left with no choice but to file this lawsuit to have the Court declare that the Class B shares of XRI stock are still in GH Blue's

included XRI's competitors, a risk that the LLC Agreement sought to prevent through its transfer restriction provisions. XRI alleges it expended considerable funds defending that litigation and resolving the Texas Action through a settlement agreement. On remand, the trial court, in the exercise of its discretion, should consider the amount of damages to which XRI is entitled for its expenditures in the Texas Action resulting from Holifield's breach of contract.

### b. Recoupment of Legal Fees

Under the LLC Agreement, XRI is entitled to recoup amounts it advanced to Holifield upon "a final and non-appealable judgment entered by a court of competent jurisdiction determining that such act or omission constituted gross negligence or willful breach of [the LLC] Agreement."[210] Such conduct is deemed "Disabling Conduct."[211] The Court of Chancery did not decide whether Holifield willfully breached or acted with gross negligence when he effectuated the Blue Transfer, the conclusion required by the parties' contract. Instead, the trial court ruled that "the factual findings in the Opinion regarding XRI's knowing participation in the Blue Transfer preclude any relief under section

---

possession, or, alternatively, void any transfer of the shares to XRI and force a commercially reasonably sale, as the UCC requires.").

[210] App. to Opening Br. at A0090 (LLC Agreement § 4.07(a)), A0093-94 (LLC Agreement § 5.04(a)).

[211] *Id.*

8.01(a)."[212] Holifield contends that with these factual findings, the court, in effect, found that Holifield believed "reasonably and in good faith" that XRI consented to the transfer.[213]

Even if on remand the Vice Chancellor concludes that Holifield's actions in breaching the No Transfer Provision did not amount to Disabling Conduct, XRI also alleges that Holifield willfully breached, or at least was grossly negligent in breaching, the No Encumbrance Provision. Because XRI could recoup expenses for a willful or grossly negligent breach of the No Encumbrance Provision, the trial court, on remand, should determine whether the No Encumbrance Provision was breached, and if so, whether his conduct constituted Disabling Conduct.

As a final observation, although the Court of Chancery found the result in favor of XRI to be "disquieting," from our standpoint, the facts as found reflect conduct on both sides of the "v" that is disquieting.[214] For example, if Holifield truly believed that his Assurance Loan structure was completely on "his side of the ledger," and if it were so clear to him that the No Encumbrance Provision could not be extended to the types of rights that a general creditor would have without breaching the No Encumbrance Provision, why would he go to such lengths to withhold the details of the loan? And why would he represent that the transfer was for estate planning purposes when that was not the case?

---

[212] App. to Answering Br. at B0346 (Final Order and Judgment ¶ 8(a), (b)).

[213] *Chancery Opinion*, 283 A.3d at 590, 604.

[214] XRI's conduct in sending a legal notice to a defunct address might fall into this category as does Holifield's illusory estate planning, for example.

It could be that Holifield simply did not wish to bother the Morgan Stanley XRI representatives with the matter, as the Vice Chancellor found. Or it could be that after receiving Morgan Stanley's clear message following their rejection of his second-position pledge idea, Holifield feared that the Assurance Loan was actually too close to the middle "of the ledger," or would invite "trouble with Morgan Stanley" by encroaching on XRI's "side of the ledger." The litigation and settlement with Assurance in Texas suggests that the arrangement actually did present a close question, as the Vice Chancellor recognized.[215] Gabriel may have figured it all out, as the Vice Chancellor concluded, but it also appears that Gabriel was trying to secure from Holifield restoration of his equity interest in Entia (which Gabriel had transferred to Holifield for one dollar in April 2018).[216]

Further, it is unclear to us how XRI actually benefitted from this transfer, given its perfected security interest in the Disputed Units and the resulting Texas Litigation. And as for its delay after receiving the documents in April 2019, it seems reasonable that, having reserved its rights, XRI would not take action until after Holifield defaulted in 2020. The bottom line is that based on the record as we view it, the questionable conduct is not tilting so heavily in either side's favor, and we are not convinced that the result in XRI's favor is "disquieting" and "inequitable."

---

[215] For example, in the proceedings below, Holifield distinguished between a right attached to the Disputed Units themselves, versus a right attached to a share of the proceeds from any distribution generated by a sale of the Disputed Units after the proceeds reach Holifield's pocket. This is likely a thorny and "close" question as noted by the Vice Chancellor. *See Protech Mins., Inc. v. Dugout Team, LLC*, 284 A.3d 369, 377 (Del. 2022).

[216] *Chancery Opinion*, 283 A.3d at 604.

However, the factual record speaks for itself and the findings have not been challenged in this appeal. Nor are we suggesting, by these comments, that they are clearly erroneous, particularly as some of them are based upon credibility determinations. But the factual and legal determinations are incomplete. The parties should have an opportunity to address the breach, damages, and recoupment issues on remand.[217] We leave to the Vice Chancellor's discretion as to whether and how the record might need to be supplemented.

Accordingly, we REVERSE the Court of Chancery's judgment that XRI's claim for damages and recoupment of legal expenses are waived and REMAND for the trial court to determine: (1) whether Holifield's conduct in breaching the No Transfer Provision rose to the level of Disabling Conduct; (2) the amount of damages XRI is entitled to recover for Holifield's breach of the LLC Agreement; (3) whether Holifield breached the No Encumbrance Provision; and (4) if Holifield breached the No Encumbrance Provision, whether his conduct was Disabling Conduct under the LLC Agreement. In the event of a finding of a breach of the LLC Agreement in a manner that constitutes Disabling Conduct, the court should order recoupment of the legal fees advanced to Holifield under the LLC Agreement in an amount within the court's discretion.

---

[217] *See Coster v. UIP Cos.*, 255 A.3d 952, 964 (Del. 2021) (this Court identified facts found by the Court of Chancery supporting the conclusion that the board had acted inequitably, we recognized that the court also had found facts "inconsistent with this conclusion," and accordingly, we directed that "the court should have an opportunity to review all of its factual findings in any manner it sees fit in light of its new focus").

## IV. CONCLUSION

The judgment of the Court of Chancery that the Blue Transfer is void is AFFIRMED. The judgment of the Court of Chancery that XRI's claims for breach of contract damages and recoupment of legal expenses were not preserved pending appeal, and that the finding of acquiescence precludes relief in both cases, is REVERSED. The case is remanded for further proceedings consistent with this opinion.

## V.    Exhibit A

**The Blue Transfer & Assurance Loan**



[1] Orange arrows indicate loan and security relationships.  Blue arrows indicate ownership interests.

[2] The dispute in this litigation is whether this transfer of Disputed Units from Holifield to Blue is valid.

[3] Class C units are "management units" held by "management members."  They are not at issue in this litigation.

[4] All entities are Delaware entities.